IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

MAY 1999 SESSION

FILED

January 13, 2000

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | C.C.A. No. 03C01-9808-CR-00313 |
| Appellee, | ) | |
| | ) | Knox County |
| v. | ) | |
| | ) | Honorable Ray L. Jenkins, Judge |
| JIMMY RAY CURETON, | ) | |
| | ) | (Felony Murder, Attempted Aggravated |
| Appellant. | ) | Robbery) |

FOR THE APPELLANT:

KENNETH F. IRVINE, JR.
Eldridge, Irvine & Hendricks, PLLC
606 West Main Street, Suite 350
P. O. Box 84
Knoxville, TN  37901-0084

FOR THE APPELLEE:

PAUL G. SUMMERS
Attorney General & Reporter

ERIK W. DAAB
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN  37243

RANDALL E. NICHOLS
District Attorney General

FRED BRIGHT, JR.
Assistant District Attorney General

SALLY JO HELM
Assistant District Attorney General
400 Main Street
P. O. Box 1468
Knoxville, TN  37901-1468

OPINION FILED: _____

AFFIRMED IN PART, REVERSED IN PART AND REMANDED

ALAN E. GLENN, JUDGE

# O P I N I O N

The defendant, Jimmy Ray Cureton, appeals as of right following his conviction by a jury in the Knox County Criminal Court of one count of felony murder and one count of attempted especially aggravated robbery. Upon the defendant's motion, which was opposed by the State, the trial court reduced the attempted especially aggravated robbery conviction to attempted aggravated robbery. The trial court sentenced the defendant to life with the possibility of parole for the felony murder conviction and to five years for the attempted aggravated robbery conviction, ordering that these sentences be served consecutively. The defendant timely appealed, presenting four issues for review:

> (1) Whether the evidence was insufficient to convict him of first degree felony murder and attempted aggravated robbery.
>
> (2) Whether he was denied a fair trial by the introduction of false testimony, the failure of the state to provide exculpatory evidence and the restriction of defense proof.
>
> (3) Whether the trial court erred in failing to dismiss the charge of attempted aggravated robbery where the statute of limitations had expired before he was charged with that offense.
>
> (4) Whether the sentence in this case was excessive based on the trial court's erroneous application of enhancement factors and the erroneous ordering of consecutive sentencing.

The State has asked for reinstatement of the conviction for attempted especially aggravated robbery. Based upon our review of this matter, we affirm the conviction for felony murder, reverse the trial court's reduction of the conviction for attempted especially aggravated robbery, and reinstate that conviction. Further, we remand the matter to the trial court for sentencing on the attempted especially aggravated robbery conviction.

## FACTS

On January 26, 1990, Windham "Bill" Frye was shot and killed outside the Corner Market & Deli in Knoxville. Frye, the owner of the Corner Market & Deli, had worked that

2

night with two of his employees, Shawn Ferrell and Daniel Sabol. At some point during the night, the defendant and Johna Zack Massey entered the store to purchase cigarettes. After arguing with Frye over the price of the cigarettes, the defendant and Massey left the store. Ferrell and Sabol left the store shortly before 8:00 p.m., the normal closing time. At approximately 8:22 p.m., the Knox County Sheriff's Department received a call about a shooting at the store. When law enforcement officers arrived, Frye was lying near death, close to the front door of his store. The defendant and Massey were questioned after the shooting occurred, but neither was charged at that time.

Although the investigation of the shooting continued after 1990, no significant progress was made. After investigating officers received additional information in February 1996, the defendant was taken into custody. April Joiner, one of the defendant's co-workers at a Blount County Taco Bell in 1994, apparently saw his picture on a television news show and telephoned the Knox County Sheriff's Department regarding knowledge she had of the matter. The defendant was charged with the homicide. Because the defendant was 17 at the time of the shooting, the trial court conducted a hearing to determine whether he should be tried as a juvenile or as an adult. After considering the evidence and testimony presented, the trial court ordered that he be tried as an adult. The trial was conducted on May 18, 19, and 20, 1998, in the Criminal Court for Knox County. In view of the nature of the evidence, a review of the testimony presented at trial is necessary for our discussion.

Jackie Fish, who, at the time of the shooting was a sergeant with the Knox County Sheriff's Department in charge of crime scene investigation, testified for the State. On the night of January 26, 1990, Sergeant Fish arrived at the scene of the shooting, secured the area, and collected evidence. Frye's body was lying outside the store. Fish stated that a bank bag containing $6,856.61 in cash and $22,865.75 in business checks was found by the victim's body. Above Frye's hand was a handgun loaded with four bullets and one spent casing, indicating the gun had been fired once.

3

Benny Abbott, who lived across the street from the Corner Market & Deli, testified that he heard a shot shortly after 8:00 p.m. the night of the shooting. He ran to the back door of his home and saw Frye in front of the store, bent over and facing south. Abbott told his wife to call 911 and then ran to assist Frye. As Abbott ran toward Frye, he saw Frye stumble to his feet, fire a pistol into the air, and then fall to the ground. According to Abbott, Frye said only, "help me, please help me." Abbott did not notice anything unusual at the store, nor did he see anyone running away from the shooting.

The first officer to arrive at the scene was John Carter, a detective with the Knox County Sheriff's Department. Carter stated that he arrived at the scene of the shooting about six minutes after he received a call from his dispatcher. When he arrived, Frye was lying face down in front of the store surrounded by a group of four or five people. Carter dispersed the crowd and tried to assist Frye. Carter rolled Frye over onto his back and saw that he was having trouble breathing and was bleeding from around his throat and mouth. Next to Frye's body were a money bag and a pistol.

Brenda Canatzer, the defendant's girlfriend at the time of the shooting, testified that the defendant called her at home the day after the shooting. According to Canatzer, the defendant said he was being accused of murder, but did not do it. He told Canatzer he went to Frye's store to buy cigarettes, but did not have enough money. He told her that he left the store to go to a friend's house for more money. When he returned to the store, Frye was dead.

April Joiner, the defendant's shift manager at a Blount County Taco Bell in 1994, testified that in either August or September of 1994 she gave the defendant and Dante Carr, another Taco Bell employee, a ride home from work at 3:30 a.m. When the three arrived at the defendant's apartment, Carr and the defendant began drinking malt liquor. At some point after they arrived, the defendant asked Joiner if she remembered "the guy getting shot over in south Knoxville." The defendant then showed Joiner a scrapbook containing two articles about the shooting, as well as Frye's obituary. Several paragraphs

4

in one article were highlighted. The highlighted portions of the article stated that two juveniles seen at the store the night of the shooting were being questioned. This scrapbook was admitted into evidence. Joiner testified she asked the defendant if he knew who did the shooting and that he replied, "I was the triggerman." Joiner stated the defendant also told her that after the shooting "they" ran behind a bar on the railroad tracks across the street from the store where "they" buried the gun and watched the scene as onlookers and sheriff's deputies arrived. Joiner testified that the defendant never named any other persons involved nor identified what kind of gun was used, but did describe the events as including someone in addition to himself.[1]

On cross-examination, Joiner testified she had been a regular marijuana user for eight years and that she pleaded guilty to theft in 1993. Joiner described the defendant's demeanor as "nonchalant" or "bragging" when he made the statement that he was the triggerman. A few weeks after he told her about his involvement in the shooting, Joiner told her stepfather about the incident. Joiner's stepfather then told the Frye family about the defendant's statements, but, according to Joiner, the family did not take action because the defendant already had been cleared by the police. Joiner called the police and provided this information in February 1996, after a television news program asked for information about the shooting. Joiner took no further action with regard to the shooting or the defendant's statements.

Shawn Ferrell testified that he and Daniel Sabol were employees at the Corner Market & Deli the night of the shooting. He stated that the night of the shooting was unusual because Frye had told Ferrell and Sabol to go home early. The normal practice was for Frye to close the store at 8:00 p.m. Ferrell and Sabol would leave with Frye and watch him lock the store. The three would then get into their cars and drive away. Frye carried a pistol and a money bag as he left. Because the shooting was on a Friday, Frye would have had more money in the bag than normal to cash customers' paychecks. Ferrell stated that, on the night of the shooting, the defendant came into the store to buy

_____

[1] At the defendant's acceptance hearing, Joiner testified that he told her three persons were involved in the shooting.

5

cigarettes but did not have enough money. Massey came in later and paid for the cigarettes. Massey and the defendant then left.

On cross-examination, Ferrell stated he did not remember much about the night of the shooting, but that the statement he gave to police shortly after the shooting was accurate. In that statement, Ferrell said that the defendant came into the store to buy cigarettes, but did not have enough money. Massey paid for the cigarettes and the two left the store. According to Ferrell's statement, there was no argument between the defendant and Frye over the cigarettes.

Daniel Sabol, who had worked at the store the night of the shooting, testified that he was working the cash register when the defendant tried to buy cigarettes. The defendant was a few cents short and argued with Sabol and Frye about the purchase price of the cigarettes. Massey came into the store and asked Frye to "let me slide on it." Frye told Massey and the defendant to take the cigarettes and leave. Sabol also testified Frye had a standard routine for closing the store. Usually the three employees would leave together, but the night of the shooting Frye told Sabol and Ferrell they could leave early. Ferrell left before Sabol, and Sabol left the store before closing.

On cross-examination, Sabol testified he remembered the events of the night of the shooting very well. Although in his original statement to police given three days after the shooting Sabol did not mention an argument between Frye and the defendant, at trial he stated he remembered "words exchanged" over the cigarettes.

Kimberly Denise Conner testified as a State's witness that she saw the defendant and Massey at the store the night of the shooting. They were outside the store thirty to forty-five minutes before the store closed.

On cross-examination, Conner stated she did not see the defendant or Massey with a weapon of any kind the night of the shooting. Conner also stated her father collected

6

newspaper clippings about the shooting, and she knew several people who had done the same because they knew Frye.

Dr. Elvin V. Davidson testified as an expert witness for the State. Dr. Davidson was a surgeon in private practice and an assistant medical examiner for Knox County at the time of the shooting. He was called to the store the night of the shooting. Based upon his observations at the scene and his examination of Frye's body, Dr. Davidson concluded Frye died as a result of a shotgun wound to the lower face, neck, and chest. On cross-examination, Dr. Davidson testified that nothing from his observations pointed to a particular person who may have killed Frye.

Mike Upchurch, a detective with the Knox County Sheriff's Department when the shooting occurred, also testified as a State's witness. He participated in the initial investigation of the shooting and worked on the investigation throughout the history of the case. Upchurch and Lieutenant Larry Johnson interviewed the defendant and Massey the evening of the shooting. According to Upchurch, the defendant stated he was at the store the night of the shooting. The defendant said that he and Massey went to the store to buy cigarettes, but did not have enough money. After buying the cigarettes, the defendant and Massey left the store and went to the apartment of Massey's uncle. Someone told them that the police were looking for a yellow Gremlin automobile. They had been riding in Massey's Gremlin that night, so they decided to return to the store to find out what the police wanted. At that time, the defendant did not profess to have any knowledge as to how Frye was killed. Upchurch stated a search was conducted in the immediate area of the store, but no murder weapon was found. He stated that in 1996 after April Joiner provided law enforcement authorities with information, the Criminalistics Unit of the Knox County Sheriff's Department conducted a search across the street from the store in the area where the defendant told Joiner the gun was buried. The area had changed in the six years since the shooting, however. Several mobile homes were parked there and the parking lot had been paved.

On cross-examination, Upchurch testified that he did not know when the 1996 weapon search occurred. He stated that he did not know of any tests that were run on bloodstains near Frye's body. No hair or fiber evidence was collected at the scene of the shooting. The defendant's hands and clothes were not tested for gunpowder residue the night of the shooting. An inventory search of Massey's Gremlin revealed no shotgun or weapon of any kind. Upchurch stated that several persons other than the defendant claimed to have killed Frye. Part of his investigation involved the trial of two defendants, Johnson and Gibson, for an earlier burglary of the Corner Market & Deli. Johnson and Gibson were scheduled to go to trial February 7, 1990, for a burglary to which Frye was the only witness. Reportedly, someone offered a bribe in exchange for Frye's not recognizing the persons involved in the burglary.

From February 1990 to February 1996, Upchurch did not have any contact with the defendant. Based on additional information, Upchurch and Knox County Sheriff's Deputy Dan Stewart took the defendant into custody around lunchtime on Friday, February 23, 1996. The defendant was not placed under arrest until 9:00 or 10:00 a.m. on Sunday, February 25, 1996. Upchurch stated that the defendant never asked to leave the police station before he was arrested. He gave several statements while at the police station. In none of these statements did the defendant ever admit any involvement in the death of Frye, nor did he say that he attempted to rob him.

Brian Stannard, a patrolman with the Knox County Sheriff's Department when the shooting occurred, testified as a State's witness. By the time of trial, he was a lieutenant with the sheriff's department. Stannard participated in the interview of the defendant on January 26, 1990. A tape of the interview and a transcript of the tape were presented to the jury during Stannard's testimony. In this statement, the defendant denied any involvement in the shooting. On cross-examination, Stannard testified that the defendant cooperated fully during the January 26, 1990, interview and, at all times, denied any involvement in the shooting.

Dan Stewart, a detective with the Knox County Sheriff's Department both when the shooting occurred and when the defendant was interviewed in February 1996, testified that he conducted interviews with the defendant on February 23, 24, and 25, 1996. Tape recordings of the defendant's statements were admitted into evidence and played for the jury during Stewart's testimony. In all three statements, the defendant stated that on the night of the shooting, he and Massey had gone in Massey's car to the Corner Market & Deli to buy cigarettes for the defendant's cousin. The defendant attempted to buy the cigarettes but was a few cents short. He returned to Massey's car to look for change. In the course of searching for change, he saw a sawed-off shotgun under a pile of clothes in the back floorboard of the car. After helping the defendant look for change in the car, Massey went into the store and bought the cigarettes. The defendant's three statements have somewhat different versions of what Massey said when he returned to the car from buying the cigarettes. In the defendant's first statement, he said that Massey had told him, "F--- that old man. I'd robbed his old ass if he didn't have a gun." In his statement given the following day, the defendant remembered Massey as saying, "That old bastard is gonna pay. Me and mama is never going to go in there again . . . I ought to rob the old bastard and take a whole carton just to piss him off." In his third statement, the defendant recounted that Massey had said that "he was gonna rob the old bastard."

The three statements also presented somewhat differing versions of what occurred after Massey had made a threatening statement. In his first statement, the defendant said only that he had waited in the car while Massey "was going to these two girls' apartment." He said that this apartment was located between two and five miles from the Corner Market. While sitting in the car, the defendant heard "either a gunshot blast or a car backfiring." After additional questioning, he said that it was a "gunshot blast." Massey returned to the car about ten minutes later and said, "Well, this matter is taken care of." As they pulled out of the apartment parking lot, they heard "ambulances and police cars" and drove back to the Corner Market, stopping at the edge of the parking lot. Officers at the scene made the two get out of their car while it was searched.

9

In his second statement, the defendant related that Massey told him to wait in the car while he went into some apartments. Massey then picked up the pile of clothes that was in the car, and the defendant assumed that the shotgun was in the pile. After additional questioning, the defendant described the pile of clothing as a "towel or small blanket or something" and said that Massey took the towel and shotgun with him as he left the car. As the defendant sat in the car, he saw Massey go around the apartment building but not into an apartment. Massey was gone for fifteen or twenty minutes, and while he was gone, the defendant heard "a loud boom" which he assumed to be a gunshot. Massey returned to the car five to seven minutes later, saying, "All this matter is taken care of, and let's go." Massey had nothing in his hands when he came back to the car. As they pulled out of the apartment parking lot, they saw police cars and followed them back to the Corner Market & Deli, where their car was searched by law enforcement officers.

In his third statement, the defendant said that Massey pulled the car into "somebody's driveway and seen that nobody was home. There was like a dark, wooded area." This location was "not even a block" from the Corner Market & Deli. According to the defendant, Massey turned off the engine and lights and then "got out of the car and kinda cupped the stock of the gun in his left hand with the barrel going up his arm, down by his side." He told the defendant that he was "going to go rob Bill Frye." The defendant remained in the car, drinking a beer. He "heard one loud explosion and then a little -- a gunshot." He told officers that he "knew that something went wrong, or something, that one of them got shot." Massey returned to the car, throwing the shotgun and a mask into the back. At some point, Massey told the defendant that "things went wrong, [that] Bill pulled a gun out on him, so he had to fire his gun or whatever so he could escape so he wouldn't get shot." With Massey driving, they went past the store "squealing tires" to Kelly Lowe's house. She was the best friend of Brenda Canatser, the defendant's girlfriend. The defendant gave the mask to Lowe and told her to "burn it." They then went to an apartment building, where Massey said that "there was two girls there that he knew and he was wanting to drop off the gun." While the defendant waited in the car, Massey got out, "wrapped up the gun in a towel," and went around the side of the building. Massey

returned to the car in a few minutes and told the defendant, "Let's go back to the store so that we wouldn't look suspicious or something. Just go back and act like we're stupid or something, like we're looking around to see what happened." As they were on the corner of the parking lot at the crime scene, Massey got out of the car, while the defendant remained inside. Officers came over and questioned both of them. The defendant said that he gave a false statement because he "was scared for [his] life." He said Massey told him that "snitches can end up dead."

Based upon the defendant's statements during the interviews and April Joiner's statement about the scrapbook she had seen in 1994, Stewart obtained a search warrant for the defendant's residence. As the warrant was being executed on February 29, 1996, Stewart found the scrapbook containing the newspaper clippings regarding Frye's death.

On cross-examination, Stewart testified he knew of no one who was an eyewitness to the shooting, nor did he know of anyone who saw the defendant involved in Frye's murder. After Stewart's testimony, the State rested. The defense called no witnesses and rested as well.

On May 20, 1998, the jury returned a verdict of guilty on the charges of felony murder and attempted especially aggravated robbery. The defendant moved for a new trial on August 20, 1998. The trial court held a hearing on his motion on August 28, 1998. At this hearing, Mike Upchurch testified that, contrary to his testimony at trial, no formal search was conducted in 1996 in the area where the defendant told Joiner the gun was buried. At best, only a visual inspection of the area took place. Among other alleged trial errors set out in the motion for new trial, the defendant also complained of discovery violations involving the State's admitted failure to provide requested information relating to rewards offered for information involving the shooting. The trial court denied the motion for a new trial, but reduced the conviction for attempted especially aggravated robbery to attempted aggravated robbery. The defendant timely appealed his convictions.

.

11

## DISCUSSION OF LAW

(1)  Whether the evidence was insufficient to convict the defendant of first degree felony murder and attempted aggravated robbery.

A defendant challenging the sufficiency of the evidence to support a conviction faces a heavy burden.  The standard of review for a challenge to the sufficiency of the evidence is whether, after considering all the evidence in the light most favorable to the State, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 318-319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Burns, 979 S.W.2d 276, 286-87 (Tenn. 1998); Tenn. R. App. P. 13(e).  In determining the sufficiency of the evidence, we will not reweigh the evidence or substitute our own inferences for those drawn by the trier of fact.  State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978); Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956).  Instead, on appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.  Cabbage, 571 S.W.2d at 835.  At this stage, it is the defendant who bears the burden of proving the evidence is insufficient to support the jury's verdict.  State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  A guilty verdict rendered by the jury, and approved by the trial judge, accredits the testimony of the witnesses for the State.  It is at this point that the presumption of innocence is replaced by a presumption of guilt.  Burns, 979 S.W.2d at 287; State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

In arguing for felony murder, the State proposed two possible theories of the case: the defendant killed Frye in a failed robbery attempt, or, in the alternative, Massey killed Frye in a failed robbery attempt and the defendant was criminally responsible for Massey's actions.  We, of course, have no way of knowing which theory the jury ultimately accepted.  However, after a review of the record, we conclude the evidence presented at trial was sufficient to support the conviction based upon either theory.  See Tenn. Code Ann. § 40-18-112 (1997) (jury shall convict if it is satisfied that the crime was committed through "either of the means charged," when it is capable of being committed by different means);

12

Schad v. Arizona, 501 U.S. 624, 649, 111 S. Ct. 2491, 2506, 115 L.Ed.2d 555 (1991); State v. Lemacks, 996 S.W.2d 166, 170-71 (Tenn. 1999) (no jury unanimity concerns implicated by verdict by a jury which was invited to convict the defendant upon an alternate theory of criminal responsibility for the act of another); Charlie W. Dunn and Joyce Watkins v. State, No. 01C01-9504-CR-00119, 1999 WL 79938, at *10 (Tenn. Crim. App., Nashville, Oct. 8, 1999) (jury may reach a valid verdict despite disjunctively-presented, alternative theories of homicide – premeditated or felony murder).

Under the theory that the defendant killed Frye in a failed robbery attempt and was therefore guilty of felony murder, the State was required to prove "a reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive device or bomb." Tenn. Code Ann. §39-13-202(a)(2) (Supp. 1989).[2] Contrary to the defendant's assertion that the evidence against him was entirely circumstantial, the State presented direct evidence of the defendant's guilt. Through April Joiner's testimony, the State introduced a confession, the defendant's statement, "I was the triggerman." A confession by a defendant is direct evidence of his guilt. Monts v. State, 379 S.W.2d 34, 40 (Tenn. 1964). Circumstantial evidence of a failed robbery attempt also exists. "Robbery is the intentional or knowing taking from the person of another property of any value by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401 (Supp. 1989). At trial, testimony revealed that Frye was killed as he closed his store. He carried a money bag containing $6,856.61 in cash. The evidence also suggested Frye drew his pistol when confronted. These facts support the conclusion that a failed robbery attempt had occurred.

The defendant argued at trial, and now argues on appeal, that Joiner was not a credible witness and should not have been believed. He also argues the evidence presented does not adequately support the theory of a failed robbery attempt. Questions of witness credibility and the weight and value of the evidence presented, however, are

_____

[2]The crime occurred January 26, 1990; therefore, the felony murder and robbery statutes in effect at that time apply.

13

properly resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Evidence also exists to support the State's theory that Massey killed Frye in a failed robbery attempt and the defendant was criminally responsible for Massey's actions. To establish that he was criminally responsible for Massey's actions, the State was required to present evidence to show that the defendant acted with intent to promote or assist the commission of robbery and he solicited, directed, aided, or attempted to aid Massey to commit the offense. See Tenn. Code Ann. § 39-11-402 (1991).

Kimberly Denise Conner saw the defendant and Massey outside the Corner Market & Deli the night of the shooting. Ferrell and Sabol said Massey and the defendant came into the store together and bought a pack of cigarettes not long before the shooting. In one of the defendant's statements to sheriff's deputies, he quoted Massey as saying, "I ought to rob the old bastard and take a whole carton." The defendant said he waited in the car while Massey went back to the store. After Massey returned, the defendant took Massey's ski mask to Kelly Lowe and asked her to burn it. These facts support the conclusion that the defendant acted with the intent to assist Massey in an attempt to rob Frye. Based on this testimony, the jury could have found the defendant guilty of felony murder based on criminal responsibility. State v. Carson, 950 S.W.2d 951, 956 (Tenn. 1997) ("[T]he defendant [who] initiated the robbery, supplied weapons, and was present at or near the scene of the offense" was criminally responsible for the aggravated assaults by the co-defendants against the victims inside the store being robbed and reckless endangerment which occurred when the co-defendants fled the scene, these offenses by the co-defendants being the "natural and probable consequence of the robbery that was initiated, directed, and aided by the defendant.")

The same analysis holds true for the verdict of guilty for attempted especially aggravated robbery.[3] For this charge, the State was required to prove either that (1) the

---

[3]The trial court reduced the attempted especially aggravated robbery conviction to attempted aggravated robbery due to an omission in Count Four of the indictment. Since we are reinstating the original conviction, our analysis is for the charge for which the defendant was convicted.

defendant attempted to commit robbery with a deadly weapon and Frye suffered serious bodily injury, or (2) Massey attempted to commit robbery with a deadly weapon, Frye suffered serious bodily injury, and the defendant was criminally responsible. See Tenn. Code Ann. §§ 39-13-403 & 39-11-402 (1991).

As previously discussed, the State presented evidence that Frye was killed in a failed robbery attempt and his death resulted from a shotgun wound. Either the jury chose to believe that the defendant killed Frye while trying to rob him, or that Massey killed Frye while trying to rob him and the defendant was criminally responsible. A review of the record reveals sufficient evidence to support either conclusion.

For these reasons, this assignment of error is without merit.

(2) Whether the defendant was denied a fair trial by the introduction of false testimony, the failure of the state to provide crucial exculpatory evidence and the improper restriction of defense proof.

**A. Introduction of False Testimony By Detective Mike Upchurch**

It is without question that the State may not present false testimony and that it has an affirmative duty to correct false testimony presented by State's witnesses. State v Spurlock, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). To obtain a new trial, the defendant must demonstrate that the State presented false testimony, the State knew the testimony was false, and the testimony was material. State v. Ricky Alexander Nabors, No. 02C01-9404-CC-00065, 1994 WL 716247, at *2 (Tenn. Crim. App., Jackson, Dec. 28, 1994).

The defendant alleges the State knowingly introduced false testimony through Detective Mike Upchurch. On direct examination, Upchurch testified that in 1996 the Criminalistics Unit of the Knox County Sheriff's Department conducted a search across the street from the Corner Market & Deli in the area where the defendant told Joiner the gun used to kill Frye was buried. On cross-examination, Upchurch stated that he did not conduct the search, had no personal knowledge of the search, did not order the search,

15

and was not present when the search took place. At the hearing on the motion for a new trial, Upchurch testified that a search did take place after Joiner's statement to investigating officers, but the search consisted of only a visual inspection. The defendant characterizes Upchurch's statements during direct examination and cross-examination as false testimony and argues that he was prejudiced because Upchurch's false statements gave undue credibility to Joiner's testimony.[4]

A review of Upchurch's testimony at trial and at the hearing on the motion for a new trial reveals that the testimony was difficult to follow. Nothing in the record, however, suggests the State knowingly introduced false testimony. In fact, the record shows that defense counsel extensively cross-examined Upchurch about the search and any inconsistencies in Upchurch's recollection of the events of the search. Even assuming *arguendo* that Upchurch's testimony was false rather than merely confusing, and that the State knowingly presented the false testimony, the defendant has failed to show the testimony was material.

For these reasons, this portion of the assignment of error is without merit.

## B. Alleged Failure of the State to Provide Crucial Exculpatory Evidence

In assessing the defendant's claim in this regard, we will first consider the chronology of the matter.

The victim was killed on January 26, 1990. The then Knox County District Attorney General sent a letter to Governor Ned McWherter on April 23, 1990, asking that the State of Tennessee offer a reward in the case. On May 1, 1990, counsel to Governor McWherter advised that the State would offer a reward of $2,500. According to the testimony of April Joiner, she visited the defendant's apartment in August or September of 1994, when he showed her the scrapbook and told her of his involvement in the crime. As the result of

---

[4]It would seem that the defense would have been better served with it appearing that the police conducted a thorough search, finding nothing, which was apparently the impression given to the jury, rather than the testimony revealing that the "search" was actually only a visual inspection.

seeing a story about the case on a Knoxville television station, Joiner contacted the Knox County Sheriff's Department regarding her knowledge of the crime.

On January 22, 1997, counsel for the defendant filed a Brady motion regarding any rewards offered in connection with the homicide. No information was provided to the defense prior to the trial, as to a response of that motion. The trial was conducted on May 18-20, 1998. As April Joiner was being cross-examined during the trial, she testified that, as of 1994, she had used marijuana a "couple of times a week" for about eight years and she had pled guilty to theft in 1993.

On June 26, 1998, Joiner sent a letter to the Knox County District Attorney General's office requesting payment of the reward and making reference to hardships she had undergone since 1994. One of the assistant district attorneys general, who was also a prosecutor in the trial against the defendant, responded to that letter on July 29, 1998, referring Joiner to the Knox County Sheriff's Department regarding the reward. On August 13, 1998, the Knox County District Attorney General's office provided copies of the April 23, 1990, letter from the Knox County District Attorney General asking that the State offer a reward in the matter, the May 1, 1990, response from the governor's office, and the June 26, 1998, letter from April Joiner seeking the reward. Several matters are left unclear in the record. Although there is a reference to a private reward in the matter, it is not clear whether there was such an award. Additionally, it is unclear as to whether April Joiner was ever paid the reward.

The defendant raised as an issue in his motion for new trial the fact that the State had failed to provide, until after the trial had been completed, information regarding any reward which had been offered in the case. After confirming to the trial court that defense counsel had asked, in discovery discussions prior to the trial, whether a reward had been offered, and that the prosecution had produced no evidence of such an offer, General Bright stated:

> You see my file in front of me, three Expando folders. Nowhere in–in these documents nor in the file provided us by

17

the Sheriff's Department was there any reference to an award. And I believe I can speak for General Helm that she wasn't aware of any award. We did not participate in the 1990 investigation. And, of course, we had a different district attorney and a different secretary for the district attorney.

An award had been requested through our office and had been granted by the governor's office, twenty-five-hundred-dollar award, and this I learned after the trial was concluded. And, also, that an award had been announced, whatever we want to call it, by Norman Frye, the brother of the victim, Bill Frye.

I have been informed that no one has ever contacted the Frye family about that award. Nor did I ever have a discussion with April Joiner, or any other witness, about an award, nor did she mention it to me, because I was unaware of it.

But there was a file. I later found out there was a file in our office, that I was not aware of its existence and–that's my offer.

During his cross-examination of Sergeant Mike Upchurch in the defendant's trial, defense counsel inquired about any rewards which had been offered in the matter:

Q. During the course of your investigation, you learned that there were rewards offered for the arrest and conviction of a person in this crime?

A. I knew of the one reward that–and I was advised that another one had been requested, but I do not know for sure if it was ever granted or not. I know of at least one early on in the investigation.

Q. Those were from private sources?

A. One was from the victim's brother.

Q. And then the one you heard was requested would have been officially through the state system?

A. Through–through the State of Tennessee, yes.

Q. Have you dealt with those kind[s] of rewards before?

A. I have not personally, no.

Q. Do you–is it your understanding that in order to get paid for those rewards, the information has to lead both to an arrest and a conviction?

A. That's correct.

The defendant has asserted that the failure of the State to provide, prior to the trial, information regarding these rewards constitutes a due process violation under Brady v.

Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).  The holding in Brady has been refined in subsequent holdings. In United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985), the court explained that constitutional error results in the withholding of "material" evidence, "materiality" existing "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

In Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the court further explained "materiality:"

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines" confidence in the outcome of the trial.

514 U.S. at 434, 115 S.Ct. at 1566 (citing Bagley, 473 U.S. at 678, 105 S.Ct. at 3381).

In the most recent interpretation of its ruling in Brady, the Supreme Court set out in Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999) what must be shown to establish a Brady violation:

> There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

In applying the Strickler test to this matter, we consider a number of facts to be relevant.  First, we note that the nature of the information inadvertently suppressed is very different from that which is often the subject of a suppression claim.  Indeed, the very nature of a reward is that it is meant to have the widest possible dissemination.  Although the amounts were not disclosed, the jury learned during the cross-examination of Detective Upchurch that one, and possibly two, rewards had been offered.  Even though April Joiner testified that she was inside the defendant's apartment in August or September of 1994, when he told her that he killed the victim and showed her his scrapbook, she did not tell

19

law enforcement authorities of this statement until 1996. Thus, a significant period of time passed between the time when Joiner was told of the defendant's involvement and her contacting authorities with this information. A like period of time passed between the "hardships" Joiner underwent in 1994 and her 1996 statement to law enforcement authorities. Additionally, as was obvious from the defense's cross-examination of Detective Upchurch, the defense was aware that a least one reward had been offered. Further, since Joiner did not make her request for the reward until several weeks after the trial had been concluded, the defendant could not have been advised by the prosecution that she would later claim the reward. Taking all of these facts into account, it is clear that even if the defense had been advised prior to the trial of additional information regarding any reward offered in the matter, there still is not a "reasonable probability" that "the result of the proceeding would have been different." Kyles, 514 U.S. at 433-34, 115 S.Ct. at 1565. Given the chronology of this matter, we cannot conclude that the inadvertent suppression of evidence "undermines confidence in the outcome of the trial." Bagley, 473 U.S. at 678, 105 S.Ct. at 3381. Thus, this assignment is without merit.

### C. The Trial Court Allegedly Improperly Restricted the Defense Proof

The defendant next argues that the trial court improperly limited testimony regarding an alleged confession by another suspect to the homicide. The defendant sought to question State witnesses about a letter purportedly written by Michael Andre Johnson, a defendant in a burglary trial in which the victim was the only witness. The letter stated in part, "Now that I had this hit put out, the man who owns the store can't testify against me."

Initially, defense counsel sought to show this letter to Sergeant Jackie Fish, who was in charge of the crime scene investigation for the Knox County Sheriff's Department. The defense asked Fish if she had come into possession of the letter "around March 9th of 1990." She stated that she did not recall. After the State objected to this question, defense counsel stated that he wanted to find out if Fish had "lifted prints" from the letter and, if so, "whether they were run or not." The trial court sustained the State's objection, ruling that the letter was complete "hearsay"; and the defense asked no other questions in this regard to Fish. Subsequently, in a hearing outside the presence of the jury, the trial

court stated to defense counsel that while the letter was "not irrelevant to prove that someone else did, in fact, commit the crime," defense counsel was not making this showing in the "proper way." The letter and two envelopes were then marked as an identification exhibit.

Later in the trial, as Detective Upchurch was testifying, defense counsel was allowed to question him about certain aspects of the letter, but not its contents. Upchurch testified that the letter had been turned over to Sergeant Fish to be processed for fingerprints, but, to his knowledge, the prints had not been "matched to anyone." Further, although the police reports made reference to the fact that an attempt would be made to compare the handwriting of the letter to the handwriting of one of the other suspects in the homicide, Upchurch did not know whether that had been done. During his cross-examination by defense counsel, Upchurch testified that, during the course of the investigation, law enforcement authorities "developed a number of different suspects," some of whom "had also said that they had killed Mr. Frye." The witness agreed with a statement by defense counsel that as many as three people had confessed to the killing. Upchurch further testified that, as part of the investigation, the police had "looked into" a trial scheduled for February 7, 1990, involving "a Mr. Johnson and Mr. Gibson." Frye was to testify at this trial concerning a burglary of the Corner Market & Deli in which he was the only witness. Upchurch further testified that several attempts had been made to bribe Frye so that he would no longer recognize the persons involved in that burglary. Additionally, Upchurch testified that, because of this information about the bribery attempts, there had been "a fairly extensive investigation of some people at the Penal Farm," which had gone on for a period of time between several months and a year.

The defense argues that it should have been allowed to question Sergeant Fish as to whether she had received the letter purported to be from Michael Andre Johnson, whether she had processed it for prints, and whether she participated in an attempt to compare the handwriting in the letter with that of Michael Andre Johnson. Further, the defense argues that questions to Detective Upchurch should have been allowed regarding

21

the alleged fact that Michael Andre Johnson, while incarcerated at the Knox County Penal Farm, sent "a thick envelope of cash from his cell to the front gate of the Penal Farm" the week before the victim was killed. Not having been allowed to pose these questions, the defense argues, violated the defendant's right to show that "there was another individual inclined to commit the offense."

The State argued, both in the trial and on appeal, that the trial court properly limited defense questions regarding the letter because the contents of the letter were hearsay, and the letter itself could not be authenticated. Further, on appeal, the State argues that the trial court's limitation on questions regarding the letter was a discretionary decision that should not be disturbed, absent an abuse of discretion.

Rule 804 of the Tennessee Rules of Evidence, regarding the hearsay exceptions applicable when the declarant is unavailable, provides as follows:

> (b) Hearsay Exceptions. -- The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> . . . .
>
> (3) Statement Against Interest. -- A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

The Advisory Commission Comments to this rule state:

> This rule follows modern Tennessee law by admitting declarations against penal interest as well as those against pecuniary or proprietary interest. *Breeden v. Independent Fire Ins. Co.*, 530 S.W.2d 769 (Tenn. 1975); *Smith v. State*, 587 S.W.2d 659 (Tenn. 1979). The proposal eliminates the condition espoused by *Smith* that declarations against penal interest offered by the accused in a criminal prosecution must be corroborated.

In Breeden v. Independent Fire Ins. Co., 530 S.W.2d 769 (Tenn. 1975), the court

22

set out the basic rule, later codified as Rule 804, regarding the declaration against penal interest exception to the hearsay rule:

> From this day forward, extra-judicial declarations against pecuniary or penal interests, where material, are admissible where the declarant is dead; beyond the jurisdiction of the court and the reach of its processes; is suffering from such infirmities of body or mind as to preclude his appearance as a witness, either by personal presence or by deposition; or where he is present in court and refuses to testify on the ground of self-incrimination.
>
> As a further condition of admissibility, it must be shown that the declarant was in a position to have knowledge of the facts forming the subject of his declaration; that no motive to misrepresent was present when the statement was made, and, in appropriate cases, that the party offering the declaration has made a good faith effort to secure his attendance.

530 S.W.2d at 775.

The defendant's argument that the letter purportedly written by Michael Andre Johnson was admissible as a declaration against penal interest is without merit. The defendant made no showing that Johnson was "unavailable" to testify, as is required by Rule 804 before such a statement can be admitted as an exception to the hearsay rule. No explanation was given as to why Johnson was not present at the trial. There was no showing that any attempt had been made to locate Johnson or that process had been issued to compel his attendance. Further, Johnson did not appear in court and assert his Fifth Amendment privilege against self-incrimination.[5] Thus, the letter allegedly written by him was hearsay which was not admissible pursuant to an exception to the hearsay rule.

We note that the court did allow defense counsel to question State's witnesses about others who had confessed to the crime and the fact that officers had investigated these other statements. Had the trial court allowed the defense to introduce proof as it wished regarding the alleged statements, the State could have been put in an untenable position similar to that in State v. Caughron, 855 S.W.2d 526, 541-42 (Tenn. 1993). In that case, a prison inmate made an extrajudicial statement that persons other than the

---

[5]See State v. Darryl J. Bailey, No. 02C01-9506-CR-00176, 1998 WL 855464, at *5-6 (Tenn. Crim. App., Jackson, Dec. 10, 1998) (discussing proper introduction of third party admissions); see generally Annotation: "Witness' refusal to testify on ground of self-incrimination as justifying reception of evidence of prior statements or admissions." 43 A.L.R. 3d 1413.

defendant approached him about killing a person who was possibly the victim with whom the defendant was charged with killing. When brought to court, the inmate repudiated the statements, saying that they were lies concocted to get a reward. However, the inmate refused to testify at the trial, apparently fearing that he would be charged with perjury for earlier making statements which he was then repudiating. The defense then claimed that the witness was "unavailable," meaning that his previous statements, which he recanted, were admissible, the lies being his recantation of these statements rather than the statements themselves. The court held that the trial court did not err in excluding these statements.

In this case, since the contents of the letter were not admissible, it follows that the evidence would not be admissible that Michael Andre Johnson, the week before the homicide, sent a "thick envelope of cash" from his cell to the front gate of the Knox County Penal Farm. Such evidence would have been irrelevant. Tenn. R. Evid. 401. Additionally, the ruling of a trial court on evidentiary matters is overturned only in the case of an abuse of discretion. State v. Bigbee, 885 S.W.2d 797, 807 (Tenn. 1994). We find no such abuse here.

Therefore, this portion of the assignment has no merit.

(3)     Whether the trial court erred in failing to dismiss the charge of attempted aggravated robbery where the statute of limitations had expired before the defendant was ever charged with that offense.

Due to an omission in Count Four of the indictment, the trial court reduced the jury's verdict of guilty of attempted especially aggravated robbery to guilty of attempted aggravated robbery. The defendant has argued that the statute of limitations for that offense expired before he was charged and, as a result, the charge should be dismissed.

The indictment alleges four counts, all of which are on a single page:

The Grand Jurors for the State of Tennessee, upon their oaths present that JIMMY RAY CURETON, a Juvenile, over the age of sixteen (16) years, jurisdiction of which Juvenile has been

24

transferred by the Juvenile Court of Knox County, Tennessee, to the Criminal Court for Knox County, Tennessee, in accordance with the provisions of T.C.A. § 37-1-134, heretofore, to-wit: On or about the 26th day of January, 1990, in the State and County aforesaid, did unlawfully, intentionally, deliberately and with premeditation kill Windham "Bill" Frye, in violation of T.C.A. 39-13-202, and against the peace and dignity of the State of Tennessee.

SECOND COUNT:

And the Grand Jurors aforesaid, upon their oaths, do further present that JIMMY RAY CURETON, a Juvenile, over the age of sixteen (16) years, jurisdiction of which Juvenile has been transferred by the Juvenile Court of Knox County, Tennessee to the Criminal Court for Knox County, Tennessee, in accordance with the provisions of T.C.A. § 37-1-134, heretofore, to-wit: On or about the 26th day of January, 1990, in the State and County aforesaid, did unlawfully and recklessly kill Windham "Bill" Frye during the attempt to perpetrate a felony, to-wit: robbery, in violation of T.C.A. 39-13-202, and against the peace and dignity of the State of Tennessee.

THIRD COUNT:

And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present that JIMMY RAY CURETON, a Juvenile, over the age of sixteen (16) years, jurisdiction of which Juvenile has been transferred by the Juvenile Court of Knox County, Tennessee, to the Criminal Court for Knox County, Tennessee, in accordance with the provisions of T.C.A. § 37-1-134, heretofore, to-wit: On or about the 26th day of January, 1990, in the State and County aforesaid, did unlawfully and recklessly kill Windham "Bill" Frye during the attempt to perpetrate a theft, in violation of T.C.A. 39-13-202, and against the peace and dignity of the State of Tennessee

FOURTH COUNT:

And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present that JIMMY RAY CURETON, a Juvenile, over the age of sixteen (16) years, jurisdiction of which Juvenile has been transferred by the Juvenile Court of Knox County, Tennessee, to the Criminal Court for Knox County, Tennessee, in accordance with the provisions of T.C.A. § 37-1-134, heretofore, to-wit: On or about the 26th day of January, 1990, in the State and County aforesaid, did unlawfully, intentionally and knowingly, attempt the especially aggravated robbery of Windham "Bill" Frye, that is to say, that JIMMY RAY CURETON, did by violence and by putting Windham, "Bill" Frye in fear, and by use of a deadly weapon, to-wit: gun, did attempt to take property from the person of Windham "Bill" Frye, in violation of T.C.A. 39-12-101 and T.C.A. 39-13-403, and against the peace and dignity of the State of Tennessee.

Thus, while Counts One through Three of the indictment allege that the defendant

25

killed the victim, Count Four, charging attempted especially aggravated robbery, fails to allege that the victim suffered "serious bodily injury." Because of this omission, the trial court reduced the conviction on Count Four from the charged offense of attempted especially aggravated robbery to attempted aggravated robbery, the latter charge not requiring that the victim suffer serious bodily injury. The defendant argues that Count Four is fatally defective because it fails to allege all essential elements of the crime which it purports to charge. The State, however, counters that the four counts of the indictment should be read together, and that Counts One through Three, each alleging that the defendant killed the victim, sufficiently advised the defendant that the victim died as the result of the attempted robbery, remedying the omission in Count Four.

Tennessee Code Annotated § 39-13-403 defines especially aggravated robbery as "robbery as defined in § 39-13-401: (1) Accomplished with a deadly weapon; *and* (2) Where the victim suffers serious bodily injury." Tenn. Code Ann. §39-13-401 (1991) (emphasis added). It is apparent on the face of the indictment that Count Four neglects to allege an essential element of especially aggravated robbery – serious bodily injury.

At the hearing on his motion for a new trial, the defendant moved for dismissal of the attempted especially aggravated robbery conviction. The trial court reduced the charge to attempted aggravated robbery, but refused to dismiss the conviction. The defendant asserts the attempted aggravated robbery conviction should have been dismissed because attempted aggravated robbery is a Class C felony. See Tenn. Code Ann. §§ 39-13-402 & 39-12-107 (1991). The statute of limitations for a Class C felony is four years. Tenn. Code Ann. § 40-2-101(b)(3) (1990). The offense date in this case was January 26, 1990. The first charging instrument was filed in this case on February 26, 1996, and the indictment was returned on April 7, 1997, both well past the expiration of the four-year statute of limitations for a Class C felony. However, since we are reinstating the conviction for attempted especially aggravated robbery, this issue is moot.

The legal requirements regarding the necessary allegations of an indictment are set

out in State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997) (citations omitted):

> As for constitutional requirements, the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 9 of the Tennessee Constitution guarantee to the accused the right to be informed of the nature and cause of the accusation. Generally stated, an indictment is valid if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy.

The statutory requirements for indictments are set out at Tenn. Code Ann. § 40-13-202:

> The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment. . . .

However, the question in this case is not whether the indictment, as a whole, notified the defendant of the offense, but, instead, whether informing the defendant, in Counts One through Three of the indictment, of the victim's death remedies the failure to allege in Count Four, charging attempted especially aggravated robbery, that the victim suffered "serious bodily injury" as the result of that offense.

In fact, there is a split of authority[6] as to whether each count of a multi-count indictment must stand alone or whether they can be read together.

> There is authority that there can be no aid between counts, to supply an omission in one of them, if the counts are not connected in some way, such as by internal reference, and that any such reference or incorporation must be express, not implicit. However, there is also authority that all counts of a multiple-count indictment should be read as a whole, and elements missing from one count can be supplied by another.

41 Am. Jur. 2d Indictments & Informations § 96 (1995) (footnotes omitted).

---

[6]These authorities are represented by State v. Adams, 456 S.E.2d 4 (W. Va. 1995) (each count of an indictment must be viewed as separate for purposes of determining its sufficiency) on the one hand, and, representing the contrary view, People v. Buffman, 636 N.E.2d 783 (Ill. App. 1994), and Rogers v. State, 908 S.W.2d 239, 242-43 (Tex. App.-San Antonio 1995) (citing Texas rulings that "notice" in one count of an indictment applies to other counts as well).

Previously, our courts have considered the extent to which the counts of a multi-count indictment could be read together. In State v. Youngblood, 199 Tenn. 519, 287 S.W.2d 89 (Tenn. 1956), the defendant had been charged, in a two-count indictment, with the illegal sale and storage of beer. The defendant claimed that count two of the indictment was defective and, therefore, should be quashed. In denying this motion, the court stated:

> Such different counts may, within themselves, not support an indictment but if they are properly connected with preceding counts then the two may be taken together and support an indictment. The word "*aforesaid*" as used in the second count of the indictment herein clearly referred to the preceding count. The word "aforesaid *** means next before *** said before, or in a preceding part; already described or identified." It is not necessary that each of these counts be referred to specifically by incorporating the averments of a preceding count therein but if it is reasonably clear from the averments of the second count that this is connected with and a part of the preceding count by the use of the language therein such a count may be considered good.

Youngblood, 287 S.W.2d at 91 (emphasis in original) (citation omitted).

Likewise, in Hayes v. State, 513 S.W.2d 144 (Tenn. Crim. App. 1974), citing Youngblood, this court held that the second count of an indictment, charging the defendant with the possession of a controlled substance, was not defective although it did not identify the controlled substance. The first count charged the defendant with the felony possession of Dolophine Hydrochloride (Methadone) and the language in the second count, charging the defendant with possession of "the aforesaid controlled substance," adequately described the drug. Hayes, 513 S.W.2d at 146. In State v. Thorpe, 614 S.W.2d 60 (Tenn. Crim. App. 1980), the State had appealed the dismissal by the trial court of a three-count indictment, charging the defendant with contracting to fix a criminal case, fixing a criminal case, and conspiracy to fix a criminal case. On appeal, this court affirmed the dismissal of the first two counts of the indictment because they were barred by the relevant statute of limitations and the dismissal of the third count because it failed to allege any overt act in furtherance of the conspiracy. This court distinguished Youngblood, saying that, although in that case the court looked to the indictment as a whole to satisfy the notice requirements as to the second count, the deficiency in that count was not as to an

essential element of the crime. Further, the court distinguished Hayes because the phrase "aforesaid controlled substance" referred to a controlled substance specifically referred to in count one and because, as in Youngblood, the reference was not to supply an essential element of the crime charged in count two but was for "notice" purposes. Additionally, the court questioned whether the indictment could be read as a whole since the prior counts, which were to be looked to, had been dismissed as outside the statute of limitations.

In this matter, the Knox County Grand Jury charged the defendant in a four-count indictment, all counts contained on a single page. All counts refer to the same victim and set out the same date, January 26, 1990, as being the date of each offense. Counts One, Two, and Three each specifically allege that the victim died; and Count Two alleges that the defendant killed the victim during an attempted robbery. Count Four, in conclusory language, alleges that the defendant attempted the "especially aggravated robbery" of the victim. Count Four also alleges that the "especially aggravated robbery" was in violation of Tenn. Code Ann. § 39-13-403, the proscriptive statute for especially aggravated robbery, which defines the offense as robbery which is "[a]ccomplished with a deadly weapon; and [w]here the victim suffers serious bodily injury."

Given all of this, it is clear that there was "adequate notice to both the defendant and the trial court of the offense alleged" and that the indictment, as a whole, "protects the defendant from subsequent reprosecution for this same offense." Hill, 954 S.W.2d at 729. Such a holding is consistent with that of Ruff v. State, 978 S.W.2d 95, 100 (Tenn. 1998), wherein the court noted, citing Hill, that the "traditionally strict pleading requirement" was made necessary because of "the existence of common law offenses whose elements were not easily ascertained by reference to a statute." In Ruff, the indictment alleged that the defendant had committed aggravated kidnapping, in violation of Tenn. Code Ann. § 39-13-304, which, in turn, defined kidnapping as "false imprisonment, as defined in § 39-13-302." 978 S.W.2d at 99. Although the indictment itself failed to allege the necessary culpable mental state, the court held that sufficient notice was supplied by the reference in the indictment to the proscriptive statute:

29

> We think that the reasoning in <u>Hill</u> applies with even greater force here because the mental state was provided by the statute cited in the indictment, thereby placing Smith on notice that knowledge is an element of the offense.

<u>Id</u>.

Likewise, in <u>State v. Carter</u>, 988 S.W.2d 145 (Tenn. 1999), denying the defendant's challenge to a felony murder indictment which referred to the appropriate proscriptive statute but failed to allege that the killings were reckless, the court stated:

> In this case, both felony murder indictments referenced the appropriate statute. This reference provided notice to the defendant of the applicable mens rea, notice of the offense upon which to enter the judgment, and protection from subsequent prosecution on the same offense. The indictment also meets the requirements of Tenn. Code Ann. § 40-13-202. The language of the felony murder counts was legally sufficient under <u>Ruff</u>.

988 S.W.2d at 149 (citations omitted).

For these reasons, we hold that the trial court erred in reducing the attempted especially aggravated robbery conviction to one for attempted aggravated robbery. We reinstate the conviction for attempted especially aggravated robbery and remand the matter to the trial court for sentencing on that conviction.

> (4) Whether the sentence in this case was excessive based on the trial court's erroneous application of enhancement factors and the erroneous ordering of consecutive sentencing.

In view of our reinstatement of the conviction for attempted especially aggravated robbery, and the remanding to the trial court for sentencing for that offense, this assignment of error is now moot.

**CONCLUSION**

Based upon the authorities and the reasoning set out herein, we affirm the conviction for felony murder and reinstate the conviction for attempted especially aggravated robbery. The matter is remanded to the trial court for sentencing on the

30

conviction for attempted especially aggravated robbery.

_____

ALAN E. GLENN, JUDGE

CONCUR:


_____

JAMES CURWOOD WITT, JR., JUDGE


_____

JOHN EVERETT WILLIAMS, JUDGE

31