# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs April 23, 2002

## STATE OF TENNESSEE v. JIMMY RAY CURETON

**Direct Appeal from the Criminal Court for Knox County**
**No.  62499     Ray L. Jenkins, Judge**

---

**No. E2001-01511-CCA-R3-CD**
**January 28, 2003**

---

The trial jury convicted the defendant, Jimmy Ray Cureton, of felony murder and attempted especially aggravated robbery. However, the trial court amended the defendant's attempted especially aggravated robbery conviction to attempted aggravated robbery based on the wording of the defendant's indictment. This Court subsequently reversed the trial court, finding that the indictment language was sufficient to allege attempted especially aggravated robbery. See State v. Cureton, 38 S.W.3d 64, 83-84 (Tenn. Crim. App. 2000).  We remanded the case for re-sentencing, and, upon remand, the trial court sentenced the defendant to serve ten years for his attempted especially aggravated robbery conviction consecutively to his life sentence for the felony murder conviction. The defendant now brings this direct appeal contending that his sentence is both (1) excessive and (2) improper because his indictment alleges that he merely committed attempted aggravated robbery.  After reviewing the procedural history of this case and the record of the sentencing hearing, we find that neither of the defendant's allegations merits relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

Kenneth F. Irvine, Jr., Knoxville, Tennessee, for appellant, Jimmy Ray Cureton.

Paul G. Summers, Attorney General & Reporter; Kathy D. Aslinger, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Robert L. Jolley, Jr., Assistant District Attorney General, for appellee, State of Tennessee.

**OPINION**

**Factual Background**

In the defendant's first direct appeal, this Court summarized the facts of his case as follows:

On January 26, 1990, Windham "Bill" Frye was shot and killed outside the Corner Market & Deli in Knoxville. Frye, the owner of the Corner Market & Deli, had worked that night with two of his employees, Shawn Ferrell and Daniel Sabol. At some point during the night, the defendant and Johna Zack Massey entered the store to purchase cigarettes. After arguing with Frye over the price of the cigarettes, the defendant and Massey left the store. Ferrell and Sabol left the store shortly before 8:00 p.m., the normal closing time. At approximately 8:22 p.m., the Knox County Sheriff's Department received a call about a shooting at the store. When law enforcement officers arrived, Frye was lying near death, close to the front door of his store. The defendant and Massey were questioned after the shooting occurred, but neither was charged at that time.

Although the investigation of the shooting continued after 1990, no significant progress was made. After investigating officers received additional information in February 1996, the defendant was taken into custody. April Joiner, one of the defendant's co-workers at a Blount County Taco Bell in 1994, apparently saw his picture on a television news show and telephoned the Knox County Sheriff's Department regarding knowledge she had of the matter. The defendant was charged with the homicide. Because the defendant was 17 at the time of the shooting, the trial court conducted a hearing to determine whether he should be tried as a juvenile or as an adult. After considering the evidence and testimony presented, the trial court ordered that he be tried as an adult. The trial was conducted on May 18, 19, and 20, 1998, in the Criminal Court for Knox County. In view of the nature of the evidence, a review of the testimony presented at trial is necessary for our discussion.

Jackie Fish, who, at the time of the shooting was a sergeant with the Knox County Sheriff's Department in charge of crime scene investigation, testified for the State. On the night of January 26, 1990, Sergeant Fish arrived at the scene of the shooting, secured the area, and collected evidence. Frye's body was lying outside the store. Fish stated that a bank bag containing $6,856.61 in cash and $22,865.75 in business checks was found by the victim's body. Above Frye's hand was a handgun loaded with four bullets and one spent casing, indicating the gun had been fired once.

Benny Abbott, who lived across the street from the Corner Market & Deli, testified that he heard a shot shortly after 8:00 p.m. the night of the shooting. He ran to the back door of his home and saw Frye in front of the store, bent over and facing south. Abbott told his wife to call 911 and then ran to assist Frye. As Abbott ran toward Frye, he saw Frye stumble to his feet, fire a pistol into the air, and then fall to the

-2-

ground. According to Abbott, Frye said only, "help me, please help me." Abbott did not notice anything unusual at the store, nor did he see anyone running away from the shooting.

The first officer to arrive at the scene was John Carter, a detective with the Knox County Sheriff's Department. Carter stated that he arrived at the scene of the shooting about six minutes after he received a call from his dispatcher. When he arrived, Frye was lying face down in front of the store surrounded by a group of four or five people. Carter dispersed the crowd and tried to assist Frye. Carter rolled Frye over onto his back and saw that he was having trouble breathing and was bleeding from around his throat and mouth. Next to Frye's body were a money bag and a pistol.

Brenda Canatzer, the defendant's girlfriend at the time of the shooting, testified that the defendant called her at home the day after the shooting. According to Canatzer, the defendant said he was being accused of murder, but did not do it. He told Canatzer he went to Frye's store to buy cigarettes, but did not have enough money. He told her that he left the store to go to a friend's house for more money. When he returned to the store, Frye was dead.

April Joiner, the defendant's shift manager at a Blount County Taco Bell in 1994, testified that in either August or September of 1994 she gave the defendant and Dante Carr, another Taco Bell employee, a ride home from work at 3:30 a.m. When the three arrived at the defendant's apartment, Carr and the defendant began drinking malt liquor. At some point after they arrived, the defendant asked Joiner if she remembered "the guy getting shot over in south Knoxville." The defendant then showed Joiner a scrapbook containing two articles about the shooting, as well as Frye's obituary. Several paragraphs in one article were highlighted. The highlighted portions of the article stated that two juveniles seen at the store the night of the shooting were being questioned. This scrapbook was admitted into evidence. Joiner testified she asked the defendant if he knew who did the shooting and that he replied, "I was the triggerman." Joiner stated the defendant also told her that after the shooting "they" ran behind a bar on the railroad tracks across the street from the store where "they" buried the gun and watched the scene as onlookers and sheriff's deputies arrived. Joiner testified that the defendant never named any other persons involved nor identified what kind of gun was used, but did describe the events as including someone in addition to himself.

On cross-examination, Joiner testified she had been a regular marijuana user for eight years and that she pleaded guilty to theft in 1993. Joiner described the defendant's demeanor as "nonchalant" or "bragging" when he made the statement that he was the triggerman. A few weeks after he told her about his involvement in the shooting, Joiner told her stepfather about the incident. Joiner's stepfather then told the Frye

-3-

family about the defendant's statements, but, according to Joiner, the family did not take action because the defendant already had been cleared by the police. Joiner called the police and provided this information in February 1996, after a television news program asked for information about the shooting. Joiner took no further action with regard to the shooting or the defendant's statements.

Shawn Ferrell testified that he and Daniel Sabol were employees at the Corner Market & Deli the night of the shooting. He stated that the night of the shooting was unusual because Frye had told Ferrell and Sabol to go home early. The normal practice was for Frye to close the store at 8:00 p.m. Ferrell and Sabol would leave with Frye and watch him lock the store. The three would then get into their cars and drive away. Frye carried a pistol and a money bag as he left. Because the shooting was on a Friday, Frye would have had more money in the bag than normal to cash customers' paychecks. Ferrell stated that, on the night of the shooting, the defendant came into the store to buy cigarettes but did not have enough money. Massey came in later and paid for the cigarettes. Massey and the defendant then left.

On cross-examination, Ferrell stated he did not remember much about the night of the shooting, but that the statement he gave to police shortly after the shooting was accurate. In that statement, Ferrell said that the defendant came into the store to buy cigarettes, but did not have enough money. Massey paid for the cigarettes and the two left the store. According to Ferrell's statement, there was no argument between the defendant and Frye over the cigarettes.

Daniel Sabol, who had worked at the store the night of the shooting, testified that he was working the cash register when the defendant tried to buy cigarettes. The defendant was a few cents short and argued with Sabol and Frye about the purchase price of the cigarettes. Massey came into the store and asked Frye to "let me slide on it." Frye told Massey and the defendant to take the cigarettes and leave. Sabol also testified Frye had a standard routine for closing the store. Usually the three employees would leave together, but the night of the shooting Frye told Sabol and Ferrell they could leave early. Ferrell left before Sabol, and Sabol left the store before closing.

On cross-examination, Sabol testified he remembered the events of the night of the shooting very well. Although in his original statement to police given three days after the shooting Sabol did not mention an argument between Frye and the defendant, at trial he stated he remembered "words exchanged" over the cigarettes.

Kimberly Denise Conner testified as a State's witness that she saw the defendant and Massey at the store the night of the shooting. They were outside the store thirty to forty-five minutes before the store closed.

On cross-examination, Conner stated she did not see the defendant or Massey with a weapon of any kind the night of the shooting. Conner also stated her father collected newspaper clippings about the shooting, and she knew several people who had done the same because they knew Frye.

Dr. Elvin V. Davidson testified as an expert witness for the State. Dr. Davidson was a surgeon in private practice and an assistant medical examiner for Knox County at the time of the shooting. He was called to the store the night of the shooting. Based upon his observations at the scene and his examination of Frye's body, Dr. Davidson concluded Frye died as a result of a shotgun wound to the lower face, neck, and chest. On cross-examination, Dr. Davidson testified that nothing from his observations pointed to a particular person who may have killed Frye.

Mike Upchurch, a detective with the Knox County Sheriff's Department when the shooting occurred, also testified as a State's witness. He participated in the initial investigation of the shooting and worked on the investigation throughout the history of the case. Upchurch and Lieutenant Larry Johnson interviewed the defendant and Massey the evening of the shooting. According to Upchurch, the defendant stated he was at the store the night of the shooting. The defendant said that he and Massey went to the store to buy cigarettes, but did not have enough money. After buying the cigarettes, the defendant and Massey left the store and went to the apartment of Massey's uncle. Someone told them that the police were looking for a yellow Gremlin automobile. They had been riding in Massey's Gremlin that night, so they decided to return to the store to find out what the police wanted. At that time, the defendant did not profess to have any knowledge as to how Frye was killed. Upchurch stated a search was conducted in the immediate area of the store, but no murder weapon was found. He stated that in 1996 after April Joiner provided law enforcement authorities with information, the Criminalistics Unit of the Knox County Sheriff's Department conducted a search across the street from the store in the area where the defendant told Joiner the gun was buried. The area had changed in the six years since the shooting, however. Several mobile homes were parked there and the parking lot had been paved.

On cross-examination, Upchurch testified that he did not know when the 1996 weapon search occurred. He stated that he did not know of any tests that were run on bloodstains near Frye's body. No hair or fiber evidence was collected at the scene of the shooting. The defendant's hands and clothes were not tested for gunpowder residue the night of the shooting. An inventory search of Massey's Gremlin revealed no shotgun or weapon of any kind. Upchurch stated that several persons other than the defendant claimed to have killed Frye. Part of his investigation involved the trial of two defendants, Johnson and Gibson, for an earlier burglary of the Corner Market & Deli. Johnson and Gibson were scheduled to go to trial February 7, 1990, for a

burglary to which Frye was the only witness. Reportedly, someone offered a bribe in exchange for Frye's not recognizing the persons involved in the burglary.

From February 1990 to February 1996, Upchurch did not have any contact with the defendant. Based on additional information, Upchurch and Knox County Sheriff's Deputy Dan Stewart took the defendant into custody around lunchtime on Friday, February 23, 1996. The defendant was not placed under arrest until 9:00 or 10:00 a.m. on Sunday, February 25, 1996. Upchurch stated that the defendant never asked to leave the police station before he was arrested. He gave several statements while at the police station. In none of these statements did the defendant ever admit any involvement in the death of Frye, nor did he say that he attempted to rob him.

Brian Stannard, a patrolman with the Knox County Sheriff's Department when the shooting occurred, testified as a State's witness. By the time of trial, he was a lieutenant with the sheriff's department. Stannard participated in the interview of the defendant on January 26, 1990. A tape of the interview and a transcript of the tape were presented to the jury during Stannard's testimony. In this statement, the defendant denied any involvement in the shooting. On cross-examination, Stannard testified that the defendant cooperated fully during the January 26, 1990, interview and, at all times, denied any involvement in the shooting.

Dan Stewart, a detective with the Knox County Sheriff's Department both when the shooting occurred and when the defendant was interviewed in February 1996, testified that he conducted interviews with the defendant on February 23, 24, and 25, 1996. Tape recordings of the defendant's statements were admitted into evidence and played for the jury during Stewart's testimony. In all three statements, the defendant stated that on the night of the shooting, he and Massey had gone in Massey's car to the Corner Market & Deli to buy cigarettes for the defendant's cousin. The defendant attempted to buy the cigarettes but was a few cents short. He returned to Massey's car to look for change. In the course of searching for change, he saw a sawed-off shotgun under a pile of clothes in the back floorboard of the car. After helping the defendant look for change in the car, Massey went into the store and bought the cigarettes. The defendant's three statements have somewhat different versions of what Massey said when he returned to the car from buying the cigarettes. In the defendant's first statement, he said that Massey had told him, "F--- that old man. I'd robbed his old ass if he didn't have a gun." In his statement given the following day, the defendant remembered Massey as saying, "That old bastard is gonna pay. Me and mama is never going to go in there again . . . I ought to rob the old bastard and take a whole carton just to piss him off." In his third statement, the defendant recounted that Massey had said that "he was gonna rob the old bastard."

The three statements also presented somewhat differing versions of what occurred after Massey had made a threatening statement. In his first statement, the defendant

said only that he had waited in the car while Massey "was going to these two girls' apartment."

He said that this apartment was located between two and five miles from the Corner Market. While sitting in the car, the defendant heard "either a gunshot blast or a car backfiring." After additional questioning, he said that it was a "gunshot blast." Massey returned to the car about ten minutes later and said, "Well, this matter is taken care of." As they pulled out of the apartment parking lot, they heard "ambulances and police cars" and drove back to the Corner Market, stopping at the edge of the parking lot. Officers at the scene made the two get out of their car while it was searched.

In his second statement, the defendant related that Massey told him to wait in the car while he went into some apartments. Massey then picked up the pile of clothes that was in the car, and the defendant assumed that the shotgun was in the pile. After additional questioning, the defendant described the pile of clothing as a "towel or small blanket or something" and said that Massey took the towel and shotgun with him as he left the car. As the defendant sat in the car, he saw Massey go around the apartment building but not into an apartment. Massey was gone for fifteen or twenty minutes, and while he was gone, the defendant heard "a loud boom" which he assumed to be a gunshot. Massey returned to the car five to seven minutes later, saying, "All this matter is taken care of, and let's go." Massey had nothing in his hands when he came back to the car. As they pulled out of the apartment parking lot, they saw police cars and followed them back to the Corner Market & Deli, where their car was searched by law enforcement officers.

In his third statement, the defendant said that Massey pulled the car into "somebody's driveway and seen that nobody was home. There was like a dark, wooded area." This location was "not even a block" from the Corner Market & Deli. According to the defendant, Massey turned off the engine and lights and then "got out of the car and kinda cupped the stock of the gun in his left hand with the barrel going up his arm, down by his side." He told the defendant that he was "going to go rob Bill Frye." The defendant remained in the car, drinking a beer. He "heard one loud explosion and then a little -- a gunshot." He told officers that he "knew that something went wrong, or something, that one of them got shot." Massey returned to the car, throwing the shotgun and a mask into the back. At some point, Massey told the defendant that "things went wrong, [that] Bill pulled a gun out on him, so he had to fire his gun or whatever so he could escape so he wouldn't get shot." With Massey driving, they went past the store "squealing tires" to Kelly Lowe's house. She was the best friend of Brenda Canatser, the defendant's girlfriend. The defendant gave the mask to Lowe and told her to "burn it." They then went to an apartment building, where Massey said that "there was two girls there that he knew and he was wanting to drop off the gun." While the defendant waited in the car, Massey got out,

"wrapped up the gun in a towel," and went around the side of the building. Massey returned to the car in a few minutes and told the defendant, "Let's go back to the store so that we wouldn't look suspicious or something. Just go back and act like we're stupid or something, like we're looking around to see what happened." As they were on the corner of the parking lot at the crime scene, Massey got out of the car, while the defendant remained inside. Officers came over and questioned both of them. The defendant said that he gave a false statement because he "was scared for [his] life." He said Massey told him that "snitches can end up dead."

Based upon the defendant's statements during the interviews and April Joiner's statement about the scrapbook she had seen in 1994, Stewart obtained a search warrant for the defendant's residence. As the warrant was being executed on February 29, 1996, Stewart found the scrapbook containing the newspaper clippings regarding Frye's death.

On cross-examination, Stewart testified he knew of no one who was an eyewitness to the shooting, nor did he know of anyone who saw the defendant involved in Frye's murder. After Stewart's testimony, the State rested. The defense called no witnesses and rested as well.

On May 20, 1998, the jury returned a verdict of guilty on the charges of felony murder and attempted especially aggravated robbery. The defendant moved for a new trial on August 20, 1998. The trial court held a hearing on his motion on August 28, 1998. At this hearing, Mike Upchurch testified that, contrary to his testimony at trial, no formal search was conducted in 1996 in the area where the defendant told Joiner the gun was buried. At best, only a visual inspection of the area took place. Among other alleged trial errors set out in the motion for new trial, the defendant also complained of discovery violations involving the State's admitted failure to provide requested information relating to rewards offered for information involving the shooting. The trial court denied the motion for a new trial, but reduced the conviction for attempted especially aggravated robbery to attempted aggravated robbery. The defendant timely appealed his convictions.

State v. Cureton, 38 S.W.3d 64, 67-72 (Tenn. Crim. App. 2000).

As we noted above, during our initial review of the defendant's convictions, this Court found that the trial court improperly reduced the defendant's attempted especially aggravated robbery conviction to attempted aggravated robbery. See id. at 83-84. Accordingly, we reinstated the defendant's original conviction, attempted especially aggravated robbery, and remanded the case for re-sentencing on that conviction. See id. Upon remand, the trial court sentenced the defendant to serve ten years for the attempted especially aggravated robbery conviction and ordered the defendant to serve this sentence consecutively to the life sentence for his felony murder conviction.

**Validity of Defendant's Attempted Especially Aggravated Robbery Charge**

The defendant complains that the trial court erred by failing to dismiss his attempted especially aggravated robbery charge after this Court remanded the defendant's case for re-sentencing. As in his first direct appeal of his case, the defendant alleges that his indictment for attempted especially aggravated robbery was insufficient to allege the charge because it omitted certain necessary language and accordingly was not properly presented to the grand jury. Thus, the defendant contends that his Fifth, Sixth, and Fourteenth Amendment federal constitutional rights were violated by this lack of grand jury review. However, as discussed supra, we have previously reviewed this issue in the context of the defendant's first appeal before this Court and found that the indictment at issue sufficiently alleged attempted especially aggravated robbery. See id. at 83-84. Thus, on remand, we instructed the trial court to re-sentence the defendant in light of his reinstated conviction for attempted especially aggravated robbery.

When this Court remands a case to the trial court, this Court's mandates are controlling with respect to all issues addressed in that appeal. See State v. Williams, 52 S.W.3d 109, 123-24 (Tenn. Crim. App. 2001) (citing State v. Irick, 906 S.W.2d 440, 443 (Tenn. 1995) and Barger v. Brock, 535 S.W.2d 337, 341 (Tenn. 1976), for the proposition that "inferior courts [are] obliged to abide decrees of higher courts," otherwise chaos would ensue). Accordingly, the trial court was not at liberty to reconsider, on remand, this Court's ruling that the defendant's indictment sufficiently alleges the charge of attempted especially aggravated robbery. Thus, we find that the defendant's complaint on this point lacks merit.

**Sentencing Challenge**

The defendant challenges the trial court's imposition of a ten-year sentence for his attempted especially aggravated robbery conviction and the trial court's order that the defendant serve this sentence consecutively to his life sentence for his felony murder conviction. "When reviewing sentencing issues . . . , the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In conducting our review, we must consider the defendant's potential for rehabilitation, the trial and sentencing hearing evidence, the pre-sentence report, the sentencing principles, sentencing alternative arguments, the nature and character of the offense, the enhancing and mitigating factors, and the defendant's statements. Tenn. Code Ann. §§ 40-35-103(5), -210(b); Ashby, 823 S.W.2d at 169. We are to also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." Ashby, 823 S.W.2d at 169.

## A. Propriety of Applied Enhancement Factors

We will first address the defendant's complaint that the trial court improperly sentenced him to serve a ten-year sentence for his attempted especially aggravated robbery conviction. Attempted especially aggravated robbery is a class B felony. Tenn. Code Ann. §39-13-403(b); Tenn. Code Ann. § 39-12-107(a). The sentencing range for a Range I, standard offender convicted of a class B felony is eight to twelve years. Tenn. Code Ann. § 40-35-112(a)(2). The sentence to be imposed by the trial court for a class B felony is presumptively the minimum in the range if neither enhancement nor mitigating factors are present. Tenn. Code Ann. § 40-35-210(c) (Supp. 2001). The trial court is to increase the sentence within the sentencing range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. Tenn. Code Ann. § 40-35-210(e) (Supp. 2001).

Although not entirely clear, it appears from the sentencing hearing record that the trial court enhanced the defendant's sentence from the eight-year minimum to ten years based upon its finding of the applicability of three enhancement and the lack of any mitigating factors. Based on several colloquies between the trial court and counsel, we have deduced that in the instant sentencing hearing for the defendant's attempted especially aggravated robbery conviction, the trial court applied enhancement factor (2), that "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors," factor (5), that "[t]he defendant treated the victim . . . with exceptional cruelty during the commission of the offense," and factor (10), that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high." See Tenn. Code Ann. § 40-35-114(2), (5), (10) (Supp. 2001).

Trial courts must determine applicability of a particular enhancement factor on a case-by-case basis. See State v. Lewis, 44 S.W.3d 501, 506 (Tenn. 2001) (citing State v. Lavender, 967 S.W.2d 803, 807 (Tenn. 1998)). Furthermore, the facts used to establish an element of the defendant's conviction may not also be used to establish the applicability of an enhancement factor for that conviction. See Lavender, 967 S.W.2d at 807 (citing State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994)). In the instant case, the trial court enhanced the defendant's sentence for attempted especially aggravated robbery because it found that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high." See Tenn. Code Ann. § 40-35-114(10) (Supp. 2001). In order to use this factor to enhance the defendant's conviction, the trial court must first find that the defendant created a greater risk to human life than is inherent in the offense. State v. Zonge, 973 S.W.2d 250, 259 (Tenn. Crim. App. 1997); State v. Bingham, 910 S.W.2d 448 (Tenn. Crim. App. 1995). Here, the jury convicted the defendant of having committed attempted especially aggravated robbery on the basis that the defendant used a deadly weapon and that the victim of the crime suffered serious bodily injury, namely death. See Tenn. Code Ann. § 39-13-403. In especially aggravated robbery cases, we have been reluctant to allow application of enhancement factor (10) unless the defendant's conduct created a great risk to individuals other than the victim of the defendant's crime. See State v. Hicks, 868 S.W.2d 729, 732 (Tenn. Crim. App. 1993). Here, no such risk was evident. Therefore, we find, and the state concedes, that this enhancement factor was inapplicable to the defendant's conviction. Accordingly, the trial court erred in applying it to the defendant's conviction.

However, we find that the trial court properly applied enhancement factors (2), that "[t]he defendant was a leader in the commission of the offense," and (5), that "[t]he defendant treated the victim . . . with exceptional cruelty. . . ." See Tenn. Code Ann. § 40-35-114(2), (5) (Supp. 2001). In order for enhancement factor (2) to be applicable, the trial court must determine that the defendant was a leader in the commission of the crime. "Our cases have established that enhancement for being a leader in the commission of an offense does not require that the [defendant] be the sole leader but only that she be 'a' leader." State v. Hicks, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993). We find that the proof supports the application of this factor to the defendant's case because, as noted earlier, the defendant bragged to a witness that he was the "triggerman," indicating that he assumed a leadership position in the commission of the offense.

Turning to the trial court's application of enhancement factor (5) to the defendant's conviction, we first note that exceptional cruelty is not an element of especially aggravated robbery. See Tenn. Code Ann. § 39-13-403; State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997). Furthermore, serious bodily injury, which is an element of especially aggravated robbery, is not necessary to establish exceptional cruelty. See Tenn. Code Ann. § 39-13-403; Poole, 945 S.W.2d at 98. Accordingly, this enhancement factor is potentially applicable to the defendant's attempted especially aggravated robbery conviction. In State v. Poole, 945 S.W.2d at 98, our supreme court found that a trial court had appropriately applied this enhancement factor to Poole's case because the defendant struck his victim, an elderly woman, with a baseball bat and left her lying unconscious, although it was unlikely that she would survive. Id. at 99. Similarly, in the instant case, the victim was shot with a shotgun at close range and left to die. However, the victim did not die immediately, but was able to beg for help although he died before medical aid could arrive. Therefore, per Poole, we find that the trial court correctly applied this enhancement factor to the defendant's case.

We conclude that the application of the two appropriately-applied enhancement factors discussed above, namely factors (2) and (5), are sufficient to support the trial court's imposition of the defendant's mid-range sentence. Accordingly, we affirm the defendant's ten-year sentence for his attempted especially aggravated robbery conviction.

## B. Propriety of Consecutive Sentencing

We next address the defendant's complaint that the trial court erroneously ordered him to serve his attempted especially aggravated robbery sentence consecutively to his life sentence for his felony murder conviction. A trial court may impose consecutive sentencing upon a determination that one or more of the criteria set forth in Tennessee Code Annotated section 40-35-115(b) exists. This section permits the trial court to impose consecutive sentences if the court finds, among other criteria, that "the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). However, before ordering the defendant to serve consecutive sentences on the basis that he is a dangerous offender, the trial court must find that the resulting sentence is reasonably related to the severity of the crimes, necessary to protect the public against further criminal conduct, and in accord with the general sentencing principles. See State v. Imfeld, 70 S.W.3d 698, 708-09 (Tenn. 2002); State v. Wilkerson, 905 S.W.2d 933, 938-39 (Tenn. 1995).

When determining that the defendant is a dangerous offender who should serve his sentences consecutively, the trial court stated that

[w]ith regard to the question of consecutive or concurrent sentencing, the Court finds that you are a dangerous offender, that you have little or no regard for human life. You had no hesitation about committing a crime in which the risk to human life was high and an extended sentence is necessary to protect the public against further criminal conduct, and that the consecutive sentences reasonably relate to the severity of the offenses committed.

The trial court's findings parallel the requirements of the statute addressing consecutive sentencing and Wilkerson. See Tenn. Code Ann. § 40-35-115(b); Wilkerson, 905 S.W.2d 933, 938-39. Moreover, we find that the trial court's findings are also supported by the record based on the defendant's conduct: The defendant returned to the victim's store after he had an argument with the victim regarding a cigarette purchase and shot the victim at close range with a shotgun. The defendant also returned to the scene of the crime several hours after the shooting to observe the crime scene while playing "stupid" and kept a scrapbook of clippings from newspaper stories chronicling his crime. Moreover, he bragged to one witness that he was the "triggerman." Thus, there was sufficient evidence from the record to support the trial court's finding that the defendant is a dangerous offender under the above criteria and therefore a candidate for consecutive sentencing. Based on this conclusion and our earlier discussion of the defendant's challenge to the enhancement factors applied to his conviction, we affirm the trial court's imposition of a ten-year sentence to be served consecutively to the defendant's life sentence.

**Conclusion**

In light of the foregoing, the judgment of the trial court is AFFIRMED.

_____
JERRY L. SMITH, JUDGE

-12-