IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 7, 2015

**STATE OF TENNESSEE v. JUSTIN TERRELL KNOX**

**Appeal from the Circuit Court for Madison County**
**No. 14-164     Roy B. Morgan, Jr., Judge**

_____

**No. W2014-01577-CCA-R3-CD  -  Filed October 16, 2015**

_____

The Defendant, Justin Terrell Knox, was convicted following a jury trial of aggravated statutory rape, a Class D felony. See Tenn. Code Ann. § 39-13-506(c). The trial court sentenced the Defendant to six years as a Range II, multiple offender. In this appeal as of right, the Defendant contends (1) that the State withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963); (2) that the State knowingly presented false testimony at trial; (3) that the trial court erred in admitting testimony from two of the witnesses at trial; (4) that the State failed to file a timely notice of its intent to seek enhanced punishment; and (5) that the trial court erred by ordering his sentence in this case be served consecutively to his sentence for a prior felony conviction.[1] Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Justin Terrell Knox, Henning, Tennessee, Pro Se.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; James G. Woodall, District Attorney General; and Rolf G.S. Hazlehurst, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

---

[1] For the purpose of clarity, we have reordered and renumbered the Defendant's issues from how they appeared in his brief.

The victim, K.C.,[2] testified that the Defendant was "a long time" family friend and that she had known him since she was "a little girl." K.C. was born in October 1995 and was seventeen years old in March 2013. The Defendant was born in December 1982 and was thirty years old in March 2013. K.C. testified that on March 26, 2013, the Defendant asked her to babysit his daughter. K.C. then testified that the Defendant "started texting" her that day. Later, K.C. clarified that the Defendant "had already" started sending her text messages before March 26, 2013.

When the Defendant first texted K.C., she did not recognize the number and did not know who it was. K.C. testified that the Defendant identified himself and said that her uncle had given him her cell phone number. Two photographs of K.C.'s phone showing the text messages between her and the Defendant were introduced into evidence at trial. The photographs reflected that on March 23, 2013, the Defendant texted K.C. the following messages, "But why [you] be lookin[g] at me like [that] anyway" and "[You] kno[w] w[h]at I'm talkin[g] [a]bout."

K.C. responded on March 25, 2013, that she did not know what the Defendant was talking about. The Defendant asked K.C. what she "call[ed] it," and she responded "I don[']t call it [none]." The Defendant then sent the following messages to K.C., "U playin," "Dnt play," "Damn fa real," and "U bs." K.C. did not respond to any of those messages.

K.C. testified that on either March 25 or 26, 2013, the Defendant also sent her a text message that said, "You know you want to." K.C. further testified that she responded by asking the Defendant what he was "talking about" but that the Defendant never responded. Initially, K.C. testified that it was her "understanding [the Defendant] was talking about sex," but on cross-examination, she testified that she did not know what the Defendant meant by that, "sexual or otherwise."

K.C. testified that on March 27, 2013, the Defendant came to her house in the morning to give her money for babysitting the day before. K.C. explained that she and her younger cousin were at home alone because their school was closed for spring break. K.C. recalled that her cousin let the Defendant into the house and that he came upstairs to her room to personally give her the money. The Defendant left after giving K.C. the money. K.C. admitted that the Defendant came over to her house "[a]ll the time" but testified that it was unusual for him to come upstairs to her room. K.C. testified that this was especially true because her mother and grandmother were not home at the time.

K.C. testified that the Defendant texted her later that day saying that he wanted her "to come outside" and "to talk to [her] about something." K.C. went outside and walked

---

[2] It is the policy of this court to refer to minors, as well as victims of sexual offenses, by their initials.

to where the Defendant had parked his car "down the street from [her] house by the stop sign." K.C. admitted that the Defendant did not say what he wanted to talk about, but testified that she "was under the impression he was going to give [her] some more money." K.C. testified that she asked the Defendant what he wanted to talk about but that he "wouldn't respond," so she "got in the car."

K.C. testified that she thought the Defendant would talk to her about paying her more money when she got into the car. According to K.C., the Defendant began to drive. K.C. claimed that she repeatedly asked the Defendant what he wanted to talk about and where he was taking her but that the Defendant "didn't respond." K.C. testified that she asked the Defendant to take her back home but that he continued to drive and remained silent. K.C. admitted that the Defendant never threatened her and that she had her phone with her but that she did not try to call or text anyone for help.

K.C. testified that the Defendant drove her to his house. According to K.C., she and the Defendant got out of the car and walked into the house without speaking to each other. Once inside the house, K.C. sat down on a couch. K.C. testified that the Defendant then removed her underwear and began licking her vagina with his tongue. K.C. further testified that the Defendant penetrated her vagina with his tongue. K.C. "told [the Defendant] to stop," but he refused. The Defendant then penetrated her vagina with his penis. K.C. testified that she did not want to have sex with the Defendant and that she repeatedly told him to stop.

At first, K.C. testified that the Defendant continued to attack her until she received a phone call from her cousin. Later, on cross-examination, K.C. testified that she called her cousin during the attack. Regardless, K.C. claimed that the Defendant stopped "about that time." K.C. testified that she did not tell her cousin what was happening to her during their phone conversation. After the Defendant stopped, K.C. walked back with him to his car, and he drove her home in silence. K.C. admitted that she did not try to run away from the Defendant or attempt to contact anyone for help during the drive back to her house.

Once at K.C.'s house, the Defendant told her to get out of the car and not to tell her mother, grandmother, or uncle about what had happened. K.C. admitted that the Defendant did not threaten her when he told her not to tell her family. K.C. testified that she went into the house and told her cousin what had happened. K.C. told her cousin that she "didn't know how [she] was gonna tell" her uncle about it. K.C. testified that she did not receive any phone calls or text messages from the Defendant after that day.

Sometime later, K.C. and her cousin "got into it" over a pair of shoes and K.C.'s cousin told a friend about what had happened. The friend told K.C.'s uncle, and he told K.C.'s grandmother about what the Defendant had done to K.C. K.C. testified that she

talked to her grandmother about what had happened for "a couple of days" before they told her mother about it. K.C. estimated that it was "a month later" before she told her mother. K.C.'s mother then called the police.

On cross-examination, trial counsel pointed out that K.C. had testified she was seventeen when, in fact, she was actually eighteen at the time of the trial. K.C. admitted that the photographs of her cell phone did not reflect any text messages from the Defendant saying "you know you want to" or asking her to come outside and talk. K.C. admitted that she told the police in an April 25, 2013 statement that the Defendant asked her to text pictures of herself to him but that she had not testified about that at trial. K.C. also admitted that during the preliminary hearing, she testified that she called her cousin after the rape instead of during it. On redirect examination, K.C. testified that she had been truthful during her testimony and that any "minor" discrepancies were unintentional and not lies.

K.C.'s grandmother, V.C.J.,[3] testified that the Defendant and K.C.'s uncle were "really good friends" and that she had known the Defendant for "about ten years." V.C.J. testified that she first found out about what had happened to K.C. in March 2013 when she got a phone call from the Defendant and K.C.'s uncle. V.C.J. recalled that she asked the Defendant if he had "messed with [her] granddaughter," and he said that he did. V.C.J. then asked the Defendant what he would do if someone had done something similar to his daughter, and he replied that "he would kill them."

V.C.J. testified that the Defendant asked her not to tell K.C.'s mother because she would "do something crazy." V.C.J. further testified that the Defendant admitted that he "stuck his penis into" K.C.'s vagina. According to V.C.J., this was the first time K.C.'s uncle had spoken to her about the Defendant and K.C. V.C.J. also testified that she told K.C.'s mother about the incident the next day.

V.C.J. admitted that she gave a statement to the police in May 2013 and that her statement did not "reflect that [the Defendant] said that he" penetrated K.C.'s vagina with his penis. Instead, V.C.J. said that the Defendant had "messed with" K.C. V.C.J. also admitted that she had previously testified that she found out about the incident from K.C.'s uncle.

K.C.'s mother, A.C., also testified that the Defendant was "a family friend" whom she had known for at least ten years. A.C. testified that one Sunday, she estimated that it was a month after K.C.'s spring break, she came home from work to K.C. and V.C.J. waiting on her. According to A.C., V.C.J. said that K.C. had told her that she and the Defendant had sex. A.C. then called the police. A.C. testified that while she was waiting

---

[3] In order to protect the victim's privacy, we will refer to her relatives by their initials as well.

for the police to arrive, she received a "three-way" call from K.C.'s uncle and the Defendant.

A.C. testified that she did not have time to talk to the Defendant before the police arrived but that K.C.'s uncle and the Defendant called her again the next day. According to A.C., during that conversation, the Defendant said that "he made a mistake" and that "he was sorry." However, the Defendant would not say exactly what he had done to K.C. A.C. testified that the Defendant told her that K.C. "was enticing him" with the "way she was looking at" him. A.C. also testified that the Defendant told her that "[i]f somebody [had] done something like that to [his] daughter, [he would] probably kill them."

Based upon the foregoing, the jury convicted the Defendant of aggravated statutory rape. The trial court found that the Defendant had prior felony convictions for possession of cocaine with intent to sell and conspiracy to sell cocaine and sentenced the Defendant as a Range II, multiple offender. In determining the length of the Defendant's sentence, the trial court found that he had numerous misdemeanor convictions for drug possession, driving on a revoked license, evading arrest, and traffic offenses. See Tenn. Code Ann. § 40-35-114(1). The trial court also found in mitigation that the Defendant's conduct neither caused nor threatened serious bodily injury. See Tenn. Code Ann. § 40-35-113(1). The trial court then sentenced the Defendant to six years. This appeal followed.

## ANALYSIS

### I. *Brady Violation*

The Defendant contends that the State withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). The Defendant argues that the State withheld K.C.'s cell phone and its contents from him and that evidence could have been used to impeach K.C during her trial testimony. The Defendant also argues that allowing his trial counsel to inspect the phone on the day of trial was not sufficient to satisfy the requirements of Brady. The State responds that there was no Brady violation because K.C.'s cell phone and its contents were disclosed to the Defendant's trial counsel prior to trial.

The Defendant was represented by trial counsel until his motion for new trial hearing when he requested to proceed pro se. At that hearing, the prosecutor represented that the cell phone had been in the possession of a police officer but that trial counsel was unable to inspect it due to "an issue about having it charged." The prosecutor stated that he and trial counsel inspected the phone together on the morning that the trial began. Trial counsel agreed with the prosecutor's recollection, stating that he inspected the phone the morning the trial began and that there "was no exculpatory evidence withheld."

The trial court denied the Defendant's motion for new trial with respect to this issue, finding that no exculpatory evidence was withheld.

In order to ensure a defendant's constitutional right to a fair trial, the State must provide the defendant with exculpatory evidence that is either material to guilt or relevant to punishment. State v. Ferguson, 2 S.W.3d 912, 915 (Tenn. 1999) (citing Brady, 373 U.S. at 87). This also includes evidence which could be used to impeach the State's witnesses. Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001). However, the State is not required to disclose "information that the accused already possess or is able to obtain, or information which is not possessed by or under the control of the prosecution or another governmental agency." State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992) (internal citations omitted).

Here, K.C.'s cell phone was in the possession of a police officer, and trial counsel was allowed to inspect it. When trial counsel first attempted to inspect the cell phone, its battery was not charged and he was unable to. Instead, trial counsel and the prosecutor inspected the cell phone the morning the trial began. Because the cell phone was provided to trial counsel for his inspection, it was not withheld from the Defendant in violation of Brady.

The Defendant also argues that the State committed prosecutorial misconduct by not allowing trial counsel to inspect the cell phone until the morning the trial began. "Brady generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose." United States v. Davis, 306 F.3d 398, 421 (6th Cir. 2002) (internal quotation marks omitted). "Delay violates Brady only [when] the delay causes prejudice" to the defendant. Id. The Defendant has presented no proof that he was prejudiced by the delay. In fact, trial counsel used the photographs of K.C.'s cell phone to impeach her trial testimony. Accordingly, we conclude that this issue is without merit.

*II. False Testimony*

The Defendant contends that the State knowingly presented false testimony at trial. The Defendant argues that portions of K.C.'s testimony were false because they were inconsistent with her testimony at the preliminary hearing. The Defendant further argues that K.C. testified inconsistently about her age, about when the Defendant sent her text messages, and about whether the "you know you want to" text message was sexual in nature. The Defendant also argues that K.C.'s testimony that he sent a text message stating "you know you want to" was false because no such text message was shown on the photographs of her cell phone. Finally, the Defendant argues that the State deleted or altered the text messages between himself and K.C. in order to create an inference of

-6-

guilt. The State responds that there is no proof to support the Defendant's allegations that it knowingly presented false testimony at trial.

The State "may not present false testimony and . . . it has an affirmative duty to correct false testimony presented by State's witnesses." State v. Cureton, 38 S.W.3d 64, 74 (Tenn. Crim. App. 2000). "To obtain a new trial, the defendant must demonstrate that the State presented false testimony, the State knew the testimony was false, and the testimony was material." Id. at 74-75.

However, "prosecutors are not omniscient" or finders of fact. State v. Housler, 193 S.W.3d 476, 493 (Tenn. 2006) (quoting Thompson v. Calderon, 120 F.3d 1045, 1071 (9th Cir. 1997) (Kozinski, J. dissenting)) (internal quotation marks omitted). "When a prosecutor has conflicting evidence or simply does not know the truth, he 'is entitled to retain skepticism about the evidence he presents and trust the jury to make the right judgment.'" Id. (quoting Thompson, 120 F.3d at 1071). Mere inconsistencies between a witnesses' testimony on direct and cross-examination do not necessarily evidence that the witness has testified falsely. Cureton, 38 S.W.3d at 75.

K.C.'s testimony was confusing and difficult to follow at times. Trial counsel was able to impeach K.C.'s credibility by pointing out several inconsistencies with her testimony on direct examination. Furthermore, K.C. was testifying about a traumatic event over a year after the offense took place, subjecting her memory to the corrosion of time. With respect to the Defendant's argument regarding the inconsistencies between K.C.'s preliminary hearing and trial testimonies, we note that "[s]imply because there existed inconsistencies between" the preliminary hearing and trial testimony "does not warrant the inference that the [State] knowingly introduced [false] testimony." United States v. Hemmer, 729 F.2d 10, 17 (1st Cir. 1984). Furthermore, there is no proof in the record to support the Defendant's claim that the State deleted or altered the text messages on K.C.'s cell phone. Accordingly, we conclude that this issue is devoid of merit.

### III. Admissibility of V.C.J. and A.C.'s Testimony

The Defendant contends that the trial court erred in admitting testimony from V.C.J. and A.C. during the trial. The Defendant argues that V.C.J. and A.C. lacked personal knowledge about the subject matter of their testimony, that their testimony was hearsay, that V.C.J.'s testimony was false due to inconsistencies between her prior testimony and trial testimony, and that the trial court failed to properly follow the rules of evidence regarding the admission of prior inconsistent statements in allowing V.C.J. and A.C. to testify at trial. The State responds that the Defendant has waived this issue because trial counsel made no objections to V.C.J. and A.C.'s testimony at trial. The State further responds that the record does not substantiate any of the Defendant's claims.

Because the Defendant, through trial counsel, did not contemporaneously object to V.C.J. and A.C.'s testimony, he has waived full appellate review of this issue. See Tenn. R. App. P. 36(a) (stating that full appellate review is not available when a defendant fails "to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). As such, we review this issue only to determine whether plain error review is warranted.

Plain error is warranted only when all five of the following factors have been established:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused must not have waived the issue for tactical reasons; and
> (e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Plain error review is not warranted because the Defendant has failed to show that a clear and unequivocal rule of law was breached by the admission of V.C.J. and A.C.'s testimony. V.C.J. and A.C. testified about how they learned of K.C.'s allegations against the Defendant and how they confronted the Defendant about those allegations. As such, the witnesses each had personal knowledge about the subject of their testimony. See Tenn. R. Evid. 602.

The Defendant does not identify any specific portion of V.C.J. or A.C.'s testimony which he alleges to be hearsay. To the extent that the Defendant is attempting to object to V.C.J. and A.C.'s testimony about his statements, those statements are admissible as an exception to the hearsay rule. See Tenn. R. Evid. 803(1.2) (providing an exception for admissions made by a party-opponent). With respect to the Defendant's allegation that V.C.J. testified falsely because her testimony was inconsistent with testimony at a prior hearing, such inconsistencies do not warrant an inference that the State knowingly presented false testimony. See Hemmer, 729 F.2d at 17.

Finally, the Defendant's argument that the trial court erred by not following the procedures for admission of prior inconsistent statements before allowing V.C.J. and A.C. to testify is misplaced. The Defendant argues that V.C.J. and A.C. testified inconsistently with their prior statements and that Tennessee Rules of Evidence 613(b) and 803(26) should have been applied by the trial court before allowing them to testify.

-8-

However, Tennessee Rules of Evidence 613(b) and 803(26) apply to the admission of a prior statement that is alleged to be inconsistent with a witness' trial testimony, and have no impact on the admission of the witness' trial testimony itself. Accordingly, we conclude that this issue lacks any merit.

*IV. Notice of Intent to Seek Enhanced Punishment*

The Defendant contends that the State failed to file a timely notice of its intent to seek enhanced punishment. The Defendant argues that there is no such notice in the technical record prior to his May 7, 2014 trial date and that the State did not file its notice until "a month after trial." The State responds that the record supports that a timely notice to seek enhanced punishment was filed prior to the Defendant's trial.

The Defendant was initially indicted on September 12, 2013, in case number 13-511 with one count of aggravated statutory rape. Trial counsel was appointed and requested a transcript of the preliminary hearing. The recording of the preliminary hearing could not be found and, upon the Defendant's motion, the trial court remanded the case to the city court for a new preliminary hearing. The recording of the original preliminary hearing was subsequently found, and the city court issued an order finding probable cause.

On March 31, 2014, a superseding indictment was issued, case number 14-164, again charging the Defendant with one count of aggravated statutory rape. Just before the start of the Defendant's trial on May 7, 2014, the trial court entered an order transferring all filings from case number 13-511 to case number 14-164. After trial, the State filed a notice of its proposed enhancement factors in anticipation of the Defendant's sentencing hearing.

The Defendant, acting pro se, raised the issue of the timing of the notice to seek enhanced punishment at his sentencing hearing. The trial court stated that the notice was "originally filed" in case number 13-511 and then transferred after the subsequent indictment to case number 14-164, giving the Defendant sufficient notice of the State's intent to seek enhanced punishment. The trial court made a similar statement when it denied the Defendant's motion for new trial with respect to this issue.

The State's notice of intent to seek enhanced punishment is missing from the appellate record along with several other documents that appear to have been filed in case number 13-511. It is the duty of the appellant "to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues that form the basis of the appeal." State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999). In the absence of an adequate record on appeal, we "must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim.

App. 1991). As such, we must accept the trial court's finding that the State filed its notice of intent to seek enhanced punishment in case number 13-511 and that it was transferred to case number 14-164 the day the trial began.

If the State "believes that a defendant should be sentenced as a multiple . . . offender," then it must "file a statement thereof with the court and defense counsel not less than ten (10) days before trial . . . ." Tenn. Code Ann. § 40-35-202(a). "The notice is intended to order plea-bargaining, to inform decisions concerning pleadings[,] and to aid in trial strategy." State v. Chase, 873 S.W.2d 7, 9 (Tenn. Crim. App. 1993) (citing State v. Adams, 788 S.W.2d 557, 559 (Tenn. 1990)). Failure to file such a notice "is grounds for resentencing." Id.

This court has previously held that when a "second indictment [is] a reindictment for the same offense as charged in the first indictment . . . the notice filed in the first indictment [gives] the defendant fair warning that the State intend[s] to seek an enhanced punishment for that crime." Chase, 873 S.W.2d at 9. This is because, when both indictments charge the same crime, "there [is] no reason to believe enhanced sentencing would not apply to a conviction under either indictment." Id. Here, the State filed its notice of intent to seek enhanced punishment in case number 13-511, in advance of the Defendant's May 2014 trial in case number 14-164. Accordingly, we conclude that this issue is without merit.

*V. Consecutive Sentencing With Respect to Prior Felony Conviction*

The Defendant contends that the trial court erred by ordering that his sentence in this case be served consecutively to his sentence for a prior felony conviction. The Defendant argues that his prior sentence was not fully served and that the trial court failed to take note of this fact, failed to reflect this fact on his judgment form, and failed to determine whether his sentence in this case should be served concurrently or consecutively. The Defendant argues that these failures effectively imposed consecutive sentences. The State responds that there is no evidence in the record to support the Defendant's allegations.

The record reflects that, in 2009, the Defendant was sentenced to two years for conspiracy to sell cocaine. In his brief, the Defendant contends that at the time he was sentenced in this case, he still had not completed his 2009 sentence. The Defendant argues that the trial court was made aware of this fact because it conducted a probation revocation hearing regarding the prior conviction in 2013. The Defendant also argues that the State made the trial court aware of the unserved sentence by listing it as one of his prior convictions during the sentencing hearing.

-10-

Tennessee Rule of Criminal Procedure 32(c)(2)(A) provides in pertinent part as follows:

(i) Prior Tennessee Sentence Known. If the defendant has additional sentences not yet fully served as the result of convictions in the same court or in other courts of Tennessee and if this fact is made known to the court prior to sentencing, the court shall recite this fact in the judgment setting sentence, and the sentence imposed is deemed to be concurrent with the prior sentence or sentences, unless it affirmatively appears that the new sentence being imposed is to be served consecutively to the prior sentence or sentences. The judgment to make the sentences consecutive or concurrent shall explicitly relate the judge's reasons and is reviewable on appeal.

(ii) Prior Tennessee Sentence Unknown. When prior unserved Tennessee sentences are not called to the attention of the trial judge by or on behalf of the defendant at the time of sentencing and are not included in the judgment setting the new sentence, the new sentence is deemed to be consecutive to any such undisclosed prior unserved sentence or sentences.

This court has previously held as follows:

[Rule 32(c)(2)(A)] places the burden on the [d]efendant to call the attention of the trial judge to the prior unserved in-state sentences and make sure the sentences are set out in the judgment setting the new sentence if the new sentence is to be served concurrent with rather than consecutive to the prior sentence.

State v. Leach, 914 S.W.2d 104, 108 (Tenn. Crim. App. 1995). Here, the Defendant failed to meet that burden. At no point prior to sentencing did the Defendant or his trial counsel bring any unserved sentences to the attention of the trial court. Furthermore, there is no proof in the record to substantiate the Defendant's claim that at his 2014 sentencing hearing, he was still serving his two-year sentence that had been imposed in 2009. Accordingly, we conclude that this issue is devoid of merit.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-11-