IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs December 16, 2020

**STATE OF TENNESSEE v. BALDOMERO GALINDO**

**Appeal from the Criminal Court for Knox County**
**No. 83885     Bobby R. McGee, Judge**

————————————————————

**No. E2020-00556-CCA-R3-CD**

————————————————————

A Knox County jury convicted the defendant, Baldomero Galindo, of first degree murder, for which he received a sentence of life imprisonment. In this delayed appeal, the defendant argues the trial court erred in denying his motion for mistrial following the late disclosure of several discovery materials in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). After reviewing the record and considering the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT L. HOLLOWAY, JR., JJ., joined.

J. Liddell Kirk, Knoxville, Tennessee, for the appellant, Baldomero Galindo.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme Allen, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On direct appeal, this Court summarized the facts surrounding the defendant's conviction for first degree murder, as follows:[1]

_____

[1] Due to the length of the trial court testimony, we have included only those facts relevant to the issues raised in this appeal.

This case involves a fatal assault of Heather Lovette, the [d]efendant's former girlfriend. The evidence at trial demonstrated that the victim died as a result of blunt force trauma to her head, which had been inflicted with a hammer.

Barbie Swann testified that she and the victim were best friends from age twelve forward. She said that a week before the victim was killed in August 2005, she moved out of the victim's apartment and into her grandmother's house, "two buildings up" from the victim's apartment. She said she moved because the victim was going to regain custody of her four children. She said that when she and her boyfriend lived in the victim's apartment, the [d]efendant, the [d]efendant's brother, and the victim also lived there. She said the [d]efendant was the victim's boyfriend.

. . .

Ms. Swann testified that she went to the victim's apartment around 6:00 or 7:00 p.m. on August 18 to retrieve a few belongs remaining in the apartment. She also said she felt uncomfortable because she knew the victim was trying to get away from the [d]efendant and that she and her boyfriend chose to go to the victim's apartment when the [d]efendant and his brother were away. She said she retrieved some of her property in a box. She said there was a red hammer she had borrowed from the victim in the box. She said she left the hammer on the kitchen table. She identified the hammer as the one that was an exhibit and stated that it was not missing parts of its plastic handle on August 18. Ms. Swann testified that as she and her boyfriend were walking home, they saw the [d]efendant and his brother returning. She said that her memory was vague but that her boyfriend may have spoken to them for a minute while she went ahead to her new home.

On cross-examination, Ms. Swann testified that she told the police about the hammer. She said that if this was not reflected in the tape of her interview by the police, it would be because "they would have had to cut that part out." She admitted the [d]efendant did not like that she and the victim used drugs together, but she denied suspecting that the victim asked her to move out due to pressure from the [d]efendant. She said she thought the victim and the [d]efendant planned to get married but their plans changed when the victim decided to regain custody of her children. She said the victim wanted to reunite with Michael Leuty because he would help her with the children. She acknowledged telling the police the reason the victim

wanted to reunite with Mr. Leuty was that he would provide financial assistance.

. . .

On redirect examination, Ms. Swann testified that she was [] interviewed by the authorities on [August 19,] August 26[,] and September 30. She acknowledged mentioning the hammer on September 30, although she said she thought she had mentioned it on August 26. She said she was not asked about a hammer on August 19. She said that when she was shown a photograph of the hammer at a later date, it was in a different condition than it was when she left it on the table.

. . .

[Michael] Leuty testified that he met the victim through her sister in 2002. He said that he and the victim were romantically involved and that they began living together in June 2002. He said that the victim's four children also lived in their home and that he assisted in supporting them. He said he lived with the victim "off and on" for three years. He said that the victim had a problem with crack cocaine and that he needed to stay away from crack.

Mr. Leuty testified that he and the victim were separated from February or March 2005 until the victim's birthday on August 7, 2005. He said that he did not know the [d]efendant during this time. He said he moved across the street from the victim on August 8 because he was still in love with her. He said he saw the [d]efendant at the victim's home during this time. He said he and the victim first talked about reconciliation on the following Wednesday, when the victim moved into his home. He said this was approximately August 16 or 17. He said the victim did not leave his home because she did not want the [d]efendant to know where she was.

Mr. Leuty testified that he was working for Jones Woodcrafters at the time and that he worked during the day on August 19. He said the victim was unemployed. He said that he awoke about 6:00 or 6:30 a.m. and that his boss, Michael Pruitt, picked him up around 7:30 or 8:00 a.m. He said the victim was still sleeping in his bed when he left. He said she was lying on her stomach with her head turned to the right away from the window. He said that he spoke to her before he left and that she acknowledged him. He said he left the victim a note stating that he would see her on Sunday to help

her move back into her apartment. He said he did not know whether the victim would be there when he returned that afternoon. Mr. Leuty testified that the only air conditioning in the apartment came from a window unit in Elizabeth [Koelzer's][2] bedroom.

Mr. Leuty testified that he worked eight or nine hours that day at a job site that was about five miles past Maryville and that he returned home about 6:30 p.m. He said he did not have a key to the apartment, which was locked when he came home that evening. Mr. Leuty testified that the [d]efendant's red Ford F-150 and Ford Probe were both in front of the victim's apartment that morning and when he returned that evening. He said he did not see anyone home at the victim's apartment that evening.

Mr. Leuty testified that because they were in a bad neighborhood and he had his work tools with him, his boss waited with him. He said he used Mr. Pruitt's cell phone to call Elizabeth to let him into the house but was only able to leave her a voice mail message. He said that he remembered the window to his bedroom at the back of the apartment and that he was able to open it. He said that he stepped onto the bed and that the victim was still asleep. He said that he told the victim he was home and to get up but that she did not respond. He said he ran to the front of the house to open the door for his boss and to get his tools inside. He said he then went back to the bedroom to wake the victim. He said that she was in the same position as she had been that morning and that when he began shaking her, she was unresponsive. He said that he grabbed her wrist and that it was cold. He said that he flipped her over by her shoulder. He said that when he did so, he saw blood everywhere on the bed and in a huge puddle on the floor. He said that he began screaming and stumbled out of the house. He said that he was crying and asked Mr. Pruitt to call 9-1-1. He said that the [d]efendant and his brother were standing across the street watching him cry. He said the [d]efendant's brother left in a truck, that the [d]efendant continued watching him for three or four minutes, but that the [d]efendant left in the Ford Probe before the police arrived.

Mr. Leuty testified that Detective Huckleby interviewed him three times and that he told Detective Huckleby he was not involved in the victim's death. He said that he learned in the third interview that his handprint was

---

[2] The direct appeal's spelling of Elizabeth Koelzer's last name as "Koetzler" appears to be a typographical error. Because trial counsel later clarified at the motion for new trial hearing that the correct spelling is "Koelzer," we use that name in this appeal.

in the apartment and that Detective Huckleby arrested him after this interview. He said he was in jail almost thirty days but was released on September 22. He said that he was angry but that he later provided the police with information about the victim's hammer, which he said had been her grandfather's. He said the hammer was red and had a rubber handle. He said he remembered this hammer being in the victim's apartment when they lived together previously. He said the only hammer in Elizabeth [Koelzer's] apartment was his twenty-two ounce framing hammer, which had a wooden handle. He denied hitting the victim with a hammer.

. . .

[On cross-examination,] Mr. Leuty testified that he saw a "shrink" regularly because he had nightmares about finding the deceased victim. He acknowledged that he did not find out how the victim was killed until a couple of weeks after his release from jail on September 22. He acknowledged sending an e-mail to the prosecutor on October 19, in which he described a hammer that belonged to the victim but admitted the email did not say anything about it having been her grandfather's. He acknowledged that he knew on October 19 that the [d]efendant had been charged with killing the victim. On redirect examination, Mr. Leuty said he could not be sure whether he first saw the puddle of blood underneath the bed on August 19 or after he was released from jail.

Janice Gangwer testified that she was employed by the Knoxville Police Department and that in 2005 she was assigned to the Forensic Unit. She said that on August 19, 2005, she responded to the scene of the victim's death, 1347 Alliance Avenue, where she took photographs and collected evidence. She identified several photographs of the scene.

. . .

Ms. Gangwer testified that there was a wastebasket in the kitchen that contained a black rubber grip. She said the grip was collected and submitted for DNA analysis. She said that there was a claw hammer in a drawer next to the wastebasket.

With respect to another apartment that was identified by other proof as the victim's apartment. Ms. Gangwer testified that she collected a pair of blue jeans with red spots on them. She said she also collected samples from blood stains on the door and wall of the hallway at this apartment. She said

this apartment was across the street from the apartment where the victim's body was found. She said she measured the distance between the two apartments as forty-two steps.

. . .

TBI Special Agent Jennifer Millsaps testified as an expert witness in forensic DNA analysis. She said that she analyzed items of evidence collected from the scene and compared them with standards collected from the victim, the [d]efendant, and Mr. Leuty. She said that there was blood on the sunglasses and the floor tile that matched the victim's DNA profile. She said the probability that the profile matched someone other than the victim exceeded the world population. She said that the reddish-brown stain from the porch matched the [d]efendant's DNA profile and that the probability that the profile matched someone other than the [d]efendant exceeded the world population. She said that the reddish-brown stain from the front door matched the [d]efendant's DNA in some locations but that the results were inconclusive in a few locations.

Knoxville Police Department Detective Joseph Huckleby testified that he was assigned to the Major Crimes Unit and that he investigated the victim's death. He said that he responded to 1349 Alliance Drive about 8:00 p.m. on August 19, 2005. He said that he could not tell from viewing the victim's body how she had been killed, although he could tell she had a head injury. He said her body and hair were in disarray and that there was a large amount of blood.

Detective Huckleby testified that after a witness told him the victim lived across the street, he also investigated at an apartment across the street. He said that no one was home at that apartment but that he found several items of evidence. He said he found a tool handle, a red-handled claw hammer, and stained blue jeans.

Detective Huckleby testified that after learning the [d]efendant was at a location on Pleasant Ridge Road, he traveled there and had contact with the [d]efendant for twenty or twenty-five minutes. He said that the [d]efendant had a bleeding head injury and that the [d]efendant agreed to go to the police station. He said that there was a language barrier because he did not speak Spanish, that he needed a certified interpreter present to interview the [d]efendant, and that he photographed the [d]efendant's injury but did not interview him.

- 6 -

Detective Huckleby testified that he later asked the [d]efendant to return for an interview through an interpreter and that the [d]efendant did so voluntarily. He said he interviewed both the [d]efendant and the [d]efendant's brother on August 20. He said that at that point, he did not have any information about how the victim died. He said the [d]efendant claimed to have no knowledge about the victim's death and to have last seen the victim on August 16. He said the [d]efendant claimed to have left for work between 7:45 a.m. and 8:00 a.m. and not to have returned until after he left work between 5:00 p.m. and 5:45 p.m. He said that the [d]efendant first told him the cut on his head happened at work but that he admitted in a later interview that the victim hit him.

Detective Huckleby testified that he learned from a crime technician that the bloody handprint found at the crime scene belonged to Michael Leuty. He said, however, that he did not see any blood on Mr. Leuty when he talked to him shortly after the crime. He said that he interviewed Mr. Leuty at least three times and that he eventually arrested Mr. Leuty for the victim's murder. He said that in the first interview, Mr. Leuty was unable to explain how his handprint got onto the floor and that he was upset and "elusive." Detective Huckleby identified a hammer that was recovered from a kitchen drawer at the crime scene. He also identified a "black rubber grip" that was taken from the kitchen trash can.

Detective Huckleby testified that after speaking with Agent Millsaps on the telephone and learning that some of the blood samples were the [d]efendant's, he interviewed the [d]efendant again. He said the [d]efendant came to the police station voluntarily on September 22. He identified the [d]efendant's waiver of rights form from this interview. He said that at the time, he did not know whose blood was on the hammer and that he had not seen any blood on the hammer. He said that after the interview, he immediately had Michael Leuty released and apologized to him. A videotape of the [d]efendant's September 22 statement was played for the jury, in which the [d]efendant admitted hitting the victim on the head with a hammer and claimed that she hit him first.

On cross-examination, Detective Huckleby acknowledged that his written "continuing report" omitted information he learned during the investigation. He said he did not have information from Ms. Swann and Mr. Leuty about the hammer until after the [d]efendant was arrested. He acknowledged that when he was on the scene, he had the hammer

photographed and collected despite not knowing how the victim was killed. He also acknowledged that contrary to his earlier testimony, Mr. Leuty claimed never to have touched the victim's body but that he wrote in his report that Mr. Leuty admitted having climbed over the body and having turned it over. He said his report also stated that Mr. Leuty claimed he had not looked at or seen anything on the victim's body. He also admitted that his report omitted information about a child having seen the [d]efendant and the [d]efendant's brother at the scene and said he did not include the information because he was unable to confirm it due to the child's mother not cooperating.

Detective Huckleby testified that he interviewed Elizabeth [Koelzer] four times. He denied any memory of saying to her that he thought she was responsible for the victim's death. After a portion of one of the video recorded interviews was played, he said he was unsure whether his statement to her, "I still think you did it, all I [have] to do is prove it," was about the killing.

. . .

Detective Huckleby acknowledged that the police lie to suspects "all the time" as an investigative technique. He admitted telling the [d]efendant he would not hold anything said in confidence against the [d]efendant. He admitted he knew the [d]efendant's admissions would be used against him but said he meant he would not personally hold anything against the [d]efendant. He said the [d]efendant told him that he had gone to the apartment across the street and that the victim threatened to kill him if he did not leave. Detective Huckleby said the [d]efendant claimed he "kind of blacked out" when the victim hit him and that he then saw the hammer and reacted by hitting the victim. He said the [d]efendant claimed not to remember how many times he hit the victim. He said that after the [d]efendant said he left the hammer "at the side of the apartment," he asked the [d]efendant if the hammer was in the kitchen drawer and that the [d]efendant said it was. He said that he asked whether there was a piece in the trash can and that the [d]efendant said, "Probably, I don't remember." He said the [d]efendant claimed he had not given this information during the first interview because he was scared.

Detective Huckleby clarified that in the last interview, the [d]efendant mentioned the hammer first. He admitted that he already knew about the

hammer. He said he did not recall the [d]efendant's stating where he was in the house when the victim hit him with the hammer.

. . .

The [d]efendant did not present any proof. The jury found the [d]efendant guilty of first degree murder. The trial court imposed a life sentence.

*State v. Baldomero Galindo*, E2009-00549-CCA-R3-CD, 2010 WL 4684469, at *1-10 (Tenn. Crim. App. Nov. 19, 2010), *perm. app. denied* (Tenn. Apr. 13, 2011).

Although the judgment in this case was entered on March 27, 2008, trial counsel did not file a motion for new trial until May 2, 2008, and the trial court dismissed the motion as untimely. On direct appeal, the defendant argued, in part, that the trial court erred in denying his motion for new trial based on the State's delayed disclosure of discovery materials. Because the defendant's motion for new trial was untimely, this Court reviewed the issue under plain error. After summarizing the contentious relationship between trial counsel and the prosecutor regarding the discovery in this case, this Court agreed that discovery violations had occurred. However, because the record lacked any proof of prejudice to the defendant from the violations, the defendant was not entitled to relief. *Id.* at 16-19.

Following the denial of his direct appeal, the defendant filed a timely petition for post-conviction relief, requesting the right to file a delayed motion for new trial. The trial court granted the defendant's motion and appointed counsel to represent the defendant. On March 1, 2013, the defendant filed a delayed motion for new trial, arguing, in part, that the trial court erred in declining to grant his motion for mistrial due to cumulative discovery violations by the State. Specifically, the defendant argued the State withheld information regarding Mr. Leuty's mental health treatment, Ms. Swann's third police statement, and the results of Ms. Koelzer's polygraph examination.

At the evidentiary hearing, trial counsel testified he was appointed to represent the defendant prior to his preliminary hearing. Because trial counsel was fluent in Spanish, he did not have any problems communicating with the defendant. Early in his representation, trial counsel filed a request for discovery, which he received from the prosecutor initially assigned to the case.

As part of the pre-trial discovery, trial counsel received two police statements given by Ms. Swann, and he had no reason to believe she had given any additional statements. Trial counsel also spoke with Ms. Swann prior to trial, and she did not mention anything

about seeing a hammer in the defendant's apartment on the day before the murder. However, during her direct testimony, Ms. Swann testified she had seen a red claw hammer in the defendant's apartment on the day before the murder. When trial counsel cross-examined Ms. Swann about why she had not disclosed this information to the police, Ms. Swann informed trial counsel that she had provided this information to the police. This was when trial counsel discovered Ms. Swann had given the police a third statement, which had not been disclosed to the defense. If he had received this statement at the proper time, trial counsel could have spoken with the defendant about whether Ms. Swann's statement was true or whether the defendant had seen the hammer anywhere else. On cross-examination, trial counsel agreed he could have asked Ms. Swann if she had seen a hammer in the apartment when he spoke with her prior to trial.

While preparing the defense, trial counsel attempted to speak with Mr. Leuty, but he refused to discuss the case. At trial, during cross-examination, Mr. Leuty testified he saw a mental health professional due to nightmares stemming from the trauma of discovering the victim's body. Following this disclosure, the State admitted they learned about Mr. Leuty's mental health issues the previous night but did not tell trial counsel. If trial counsel had been aware of Mr. Leuty's mental health issues the night before his testimony, he would have requested a continuance to obtain Mr. Leuty's medical records. Trial counsel would have reviewed the records to determine why Mr. Leuty was having mental health issues and to see if they resulted from Mr. Leuty's participation in the murder. Although trial counsel conceded he had no knowledge Mr. Leuty had ever confessed to participating in the murder, he noted that the police found Mr. Leuty's bloody handprint at the crime scene. On cross-examination, trial counsel conceded the trial court ruled Mr. Leuty's medical records were not relevant.

Regarding Ms. Koelzer, trial counsel received a copy of her police statements in discovery. Additionally, Ms. Koelzer spoke with trial counsel multiple times prior to trial. However, neither Ms. Koelzer nor her statements mentioned she had taken a polygraph examination in this case. During his cross-examination of Detective Huckleby, trial counsel asked to look at the report Detective Huckleby was reading from and noticed the report was several pages longer than the report trial counsel was given in discovery. Included in the longer report was information related to a failed polygraph examination by Ms. Koelzer. Trial counsel then requested permission to examine Detective Huckleby's investigation notebook and discovered Ms. Koelzer's polygraph examination report, which indicated she had been untruthful.

After the trial court was made aware of the polygraph report, which had been excluded from pre-trial discovery, the trial court ruled the State could not call Ms. Koelzer as a witness. Trial counsel testified this was "unfortunate" because he "kind of like[s] having a witness testify who's been lying about the murder." Her deception during the

polygraph examination would give the jury the "possibility of another suspect." If trial counsel had the polygraph results prior to trial, he could have discussed it with her. Although trial counsel conceded the results of the examination would not be admissible at trial, Ms. Koelzer may have had a "Perry Mason moment" if confronted with her deception and confessed to playing a role in the murder. On cross-examination, while trial counsel acknowledged he could have called Ms. Koelzer as a witness, he testified he did not "know that we ever had that conversation" because he was "neutral" toward her possible testimony. Trial counsel was also unsure whether he could ethically call Ms. Koelzer as a witness because he did not trust her after learning about the failed polygraph examination.

On cross-examination, trial counsel agreed the defendant gave a statement admitting to hitting the victim with a hammer after an argument. He also acknowledged there was physical evidence presented at trial which corroborated the defendant's statement. However, trial counsel insisted his investigation would have been different if he had been given Ms. Swann's statement, information regarding Mr. Leuty's mental health treatment, and the results of Ms. Koelzer's polygraph examination.

Philip Morton, the prosecutor at the defendant's trial, testified he was assigned to the defendant's case when the initial prosecutor, Jo Helm, left the District Attorney's Office. At that point, discovery had already been provided to the defendant, and Mr. Morton focused on preparing for trial.

Prior to trial, trial counsel filed a "notice of discovery in possession of the defense" which listed the items he had received from Ms. Helm. The notice listed several police reports but did not identify which reports they were. Instead, they were listed as "a one-page report, a two-page report, certain dates and so forth." In response, Mr. Morton filed a motion to clarify the exact discovery trial counsel possessed. When trial counsel specified which reports he had, the report numbers matched the ones in Mr. Morton's file, and he assumed trial counsel's discovery was complete. However, at trial, Mr. Morton learned that Detective Huckleby had updated one of his reports, and the new version had not been provided to either trial counsel or the State. On cross-examination, Mr. Morton testified it was possible Detective Huckleby generated a new report and did not give it to the State. Mr. Morton agreed it was the policy of the District Attorney's Office to turn over anything that was subject to discovery or that was potentially *Brady* material.

Mr. Morton was unsure why Ms. Koelzer was given a polygraph examination and could not recall whether she was considered a suspect in this case. He also could not recall whether Mr. Leuty or the defendant were given polygraph examinations in regards to this case. Although he initially testified he did not know about Ms. Koelzer's polygraph examination until trial, Mr. Morton later acknowledged it was possible he did know about the polygraph but did not attach significant weight to it because it would not be admissible

at trial. Prior to the trial court's ruling that Ms. Koelzer could not be called as a State witness, Mr. Morton had intended to call her to testify regarding her knowledge of the crime and to ask whether she had any involvement in the murder. Upon questioning from the trial court, Mr. Morton agreed information regarding Ms. Koelzer's polygraph examination was something he would have provided to the defendant.

Regarding Ms. Swann's third police statement, Mr. Morton could not recall whether Detective Huckleby had reminded him of the fact that Ms. Swann had mentioned seeing the hammer in the defendant's apartment, and Mr. Morton testified he was not trying to hide this information from the defendant.

On cross-examination, Mr. Morton testified he learned about Mr. Leuty's mental health issues the night before trial. Mr. Leuty contacted Mr. Morton and mentioned that he was seeing a mental health professional due to the trauma of having discovered the victim's body.

After its review of the evidence presented, the trial court denied the motion for new trial, and this timely appeal followed.

*Analysis*

The defendant's sole issue on appeal is the trial court's denial of the defendant's motion to declare a mistrial. Specifically, the defendant argues the State's cumulative discovery violations created prejudice which necessitates a new trial. The State contends the trial court acted within its discretion in denying the motion for mistrial based on the delayed disclosures. We agree with the State.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only in the event that a manifest necessity requires such action. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. *Id.* This Court will not disturb the trial court's decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).

Suppression of evidence favorable to the defendant is a due process violation where the evidence is material to guilt or punishment. *Brady*, 373 U.S. at 87. The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial. *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. Crim. App. 2012). In order to establish a

violation based on the withholding of favorable evidence, the defendant must demonstrate that: (1) the defendant requested the information or that it was obviously exculpatory; (2) the State suppressed evidence in its possession; (3) the information was favorable to the accused; and (4) the information was material. *State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014). Favorable evidence has also been defined as:

> evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.

*Johnson*, 38 S.W.3d at 56-57 (internal citations omitted).

Evidence is material if there is a reasonable probability the result of the proceeding would have been different had the evidence been disclosed. *State v. Cureton*, 38 S.W.3d 64, 77 (Tenn. Crim. App. 2000). A reviewing court must determine whether the defendant has shown that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict. *Johnson*, 38 S.W.3d at 58 (internal quotations omitted).

In addition, "the prosecutor is responsible for 'any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" *Strickler v. Greene*, 527 U.S. 263, 275 n.12 (1999) (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). This includes "evidence in police possession which is not turned over to the prosecution." *Jackson*, 444 S.W.3d at 594. However, the prosecution is not required to disclose information that the defendant either possesses or is able to obtain. *Johnson*, 38 S.W.3d at 56.

However, this Court must analyze the State's delayed disclosure of evidence differently than the State's non-disclosure of evidence. "Generally, if there is only a delayed disclosure of information, in contrast to a complete failure to disclose exculpatory information, *Brady* normally does not apply, unless the delay itself causes prejudice." *State v. Caughron*, 855 S.W.2d 526, 548 (Tenn. 1993) (Daughtrey, J., dissenting) (citations omitted). When there is a delayed disclosure of evidence, rather than complete non-disclosure of significant exculpatory evidence, this Court must determine whether the delay kept defense counsel from effectively using this evidence in presenting and preparing the defendant's case. *Id.* "'*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose.'" *State v. Justin Terrell Knox*, No. W2014-01577-CCA-R3-CD, 2015 WL 6122257, at *4 (Tenn. Crim. App. Oct. 16, 2015) (quoting *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002). If the defense

fails to request a continuance after receipt of the evidence, fails to call or recall a witness to testify regarding the evidence, or fails to extensively cross-examine a witness regarding the evidence, the *Brady* violation may be cured. *State v. Sidney M. Ewing*, No. 01C01-9612-CR-00531, 1998 WL 321932, at *9 (Tenn. Crim. App. June 19, 1998), *perm. app. denied* (Tenn. Feb. 22, 1999).

## A.      Barbie Swann's Third Police Statement

The defendant argues he was prejudiced because he was not given Ms. Swann's third police statement until after her testimony on cross-examination.  The State contends Ms. Swann's statement is not exculpatory and the defendant has not shown that its delayed disclosure caused prejudice.

Following Ms. Swann's testimony that she had seen a red hammer in the defendant's apartment on the day before the murder, trial counsel was given a copy of a police statement dated September 30, 2005, in which Ms. Swann told police she left the hammer on the kitchen table in the defendant's apartment on the day before the murder. The trial court asked trial counsel if he needed time to review the statement, but trial counsel declined to take the offered continuance.  During recross-examination, trial counsel questioned Ms. Swann extensively about her statement to police regarding the hammer.  Following Ms. Swann's testimony, trial counsel requested a mistrial due to the State's failure to disclose Ms. Swann's third statement.  The trial court denied the motion but instructed the prosecutor to ensure all *Jencks*[3] material was provided to the defendant.  At the motion for new trial hearing, trial counsel testified that, if he had received the statement at the proper time, he could have spoken with the defendant about whether Ms. Swann's statement was true and whether the defendant had seen the hammer anywhere else.

We conclude the delayed disclosure of Ms. Swann's third police statement indicating she had seen a hammer in the defendant's apartment prior to the murder was not prejudicial.  First, we note the information contained within the police statement was not exculpatory.  Additionally, although trial counsel testified he would have asked the defendant whether Ms. Swann's statement was true and whether the defendant had seen the hammer anywhere else, trial counsel knew the hammer was found in the defendant's apartment after the murder.  Therefore, he had evidence which could have led him to ask the defendant whether he recognized the hammer.  Furthermore, trial counsel failed to take a continuance when the trial court asked if he needed time to review the newly discovered statement, and the record shows trial counsel extensively questioned Ms. Swann regarding her statement during recross-examination.  Accordingly, the defendant is not entitled to relief on this issue.

---

[3] *Jencks v. United States*, 353 U.S. 657 (1957).

## B.     Michael Leuty's Mental Health Treatment

The defendant argues he was prejudiced by the delayed disclosure that Mr. Leuty was seeking mental health treatment because this information could have been used to impeach Mr. Leuty's testimony.  The State contends the delayed disclosure was not prejudicial because the trial court ruled the evidence was not relevant.

During cross-examination, Mr. Leuty spontaneously admitted to seeing a therapist due to nightmares stemming from his discovery of the victim's body.  When trial counsel asked if Mr. Leuty had disclosed this information to the prosecutor, Mr. Leuty stated that he told the prosecutor the previous day.  Following this admission, trial counsel continued his cross-examination of Mr. Leuty with no further mention of his mental health treatment.

Following the conclusion of Mr. Leuty's testimony, trial counsel made a second motion for mistrial, arguing that information regarding Mr. Leuty's mental health treatment was discoverable and that "psychiatric problems [] can affect his ability to perceive, his ability to remember, his ability to recall."  The trial court took the matter under advisement in order to obtain Mr. Leuty's medical records.  After reviewing the records, the trial court held that the prosecutor should have informed the defense that Mr. Leuty was receiving mental health treatment when Mr. Leuty told him the night before trial.  However, the trial court denied the motion for mistrial, holding nothing in Mr. Leuty's medical records was relevant to this case.  At the motion for new trial hearing, trial counsel testified, if he had been made aware of Mr. Leuty's mental health issues the night before trial, he would have requested a continuance in order to obtain Mr. Leuty's medical records.  Trial counsel would have then reviewed the records to determine why Mr. Leuty was having mental health issues and to see if they resulted from Mr. Leuty's participation in the murder.  However, trial counsel conceded he had no knowledge that Mr. Leuty had ever confessed to participating in the murder.

We conclude the delayed disclosure of Mr. Leuty's mental health treatment was not prejudicial.  Although trial counsel testified he would have requested a continuance to obtain the medical records, he failed to do so.  Instead, trial counsel continued his cross-examination and did not request a mistrial until after recross-examination was completed.  Trial counsel also testified that he would have reviewed the medical records to ascertain if Mr. Leuty admitted to participating in the murder.  However, the trial court reviewed the medical records in question and found that they contained no relevant information.  Furthermore, although it appears the trial court gave the defense a copy of the medical records obtained from Mr. Leuty's psychologist, the medical records are not included in the record on appeal.  Therefore, we are unable to review the trial court's determination of

their relevancy. It is the defendant's duty to provide a full and complete record. Tenn. R. App. P. 24(b). Accordingly, the defendant is not entitled to relief on this issue.

### C.      Elizabeth Koelzer's Polygraph Results

The defendant argues he was prejudiced by the delayed disclosure of Ms. Koelzer's polygraph examination report, which indicated she was untruthful, because it was received too late to be useful. The State contends the polygraph results would not have been admissible at trial and any violation was cured by the defense's failure to call Ms. Koelzer as a witness.

During the testimony of Detective Huckleby, trial counsel requested permission to review the detective's investigation notebook. Inside, trial counsel discovered a police report indicating Ms. Koelzer had failed a polygraph examination as well as the polygraph results. Following trial counsel's discovery, the trial court ruled that the fact that Ms. Koelzer had taken a polygraph and the results of the examination were not admissible for any purposes. Additionally, the trial court held Ms. Koelzer's polygraph results were *Brady* material and should have been turned over prior to trial. Instead of granting the defendant's request for a mistrial, the trial court held the State was not allowed to call Ms. Koelzer as a witness. However, although the trial court clarified that its ruling did not prevent the defense from calling Ms. Koelzer as a witness, trial counsel chose not to do so. At the motion for new trial hearing, trial counsel testified that if he had been given the polygraph results prior to trial, he could have discussed them with Ms. Koelzer. Although trial counsel conceded the results of the examination would not be admissible at trial, he believed Ms. Koelzer may have had a "Perry Mason moment" if confronted with the results and confessed to playing a role in the murder. When asked why he did not call Ms. Koelzer as a witness, trial counsel testified he no longer trusted her.

According to the polygraph report, during Ms. Koelzer's examination, the polygraph examiner detected an indication of deception to the following questions:

1. Regarding [the victim's] death, do you intend to answer truthfully all questions? (ANS: YES)
2. Did you participate in any way in causing [the victim's] death? (ANS: NO)
3. Did you lie about being asleep and not knowing that [the victim] was beaten? (ANS: NO)
4. Did you see Baldo (Baldomero Galindo) beat [the victim]? (ANS: NO)

We conclude the delayed disclosure of Ms. Koelzer's polygraph results was not prejudicial. Although a polygraph result is not admissible, this Court has previously held that a deceptive polygraph result is exculpatory. *See Lavely Brown v. State*, E2004-00886-

CCA-R3-PC, 2005 WL 1882453, at *14 (Tenn. Crim. App. Aug. 8, 2005), *perm app denied* (Tenn. Dec. 19, 2005). Here, a polygraph examination indicated Ms. Koelzer might have been untruthful about her statements regarding her involvement in the victim's murder, and the State did not disclose this information to the defense. However, while the results of the polygraph are exculpatory, we conclude they are not material. The argument that this information could have changed trial counsel's strategy or produced a "Perry Mason moment" is not supported by the proof. The defendant confessed to hitting the victim with a hammer, and his DNA was discovered at the crime scene. No testimony presented at the trial or the motion for new trial hearing suggested that Ms. Koelzer had any involvement in the commission of the crime. Moreover, the results of the polygraph examination would not have been admitted at trial, and the jury would never have been able to hear them. Finally, while trial counsel was explicitly given permission to call Ms. Koelzer as a witness during trial, he chose not to do so. The defendant is not entitled to relief on this issue.

Because he has failed to prove he was prejudiced by the State's discovery violations, we conclude the defendant has not established the "manifest necessity" required for a mistrial. Thus, the trial court did not abuse its discretion in denying the defendant's requests for a mistrial.

## *Conclusion*

Based on the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

_____
J. ROSS DYER, JUDGE